**EDWARDS v. CAPITAL AIRLINES,**
Inc., et al.

**YOUNG v. CAPITAL AIRLINES,**
Inc., et al.

Nos. 9989, 9990.

United States Court of Appeals

District of Columbia Circuit.

Argued Jan. 28, 1949.

Decided March 14, 1949.

On Petition for Rehearing May 10, 1949.
Writ of Certiorari Denied Nov. 21, 1949.
See 70 S.Ct. 186.

756

Mr. Howard C. Westwood, of Washington, D. C., with whom Mr. Edwin McElwain and Miss Amy Ruth Mahin, both of Washington, D. C., were on the brief, for appellants.

Mr. Robert B. Hankins, of Washington, D. C., for appellee Capital Airlines, Inc.

Mr. David W. Louisell, of Washington, D. C., filed a brief on behalf of Edward McCready as amicus curiae, urging reversal.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellants Edwards and Young each filed in the District Court a civil action seeking a declaratory judgment and an order enjoining appellee Capital Airlines[1] from interfering with his seniority rights.

After trial, the District Court dismissed the complaints.

Edwards and Young were first employed by Capital as probationary co-pilots on December 31, 1940, and February 18, 1941, respectively. At that time, and continuously thereafter, the Air Line Pilots Association was the authorized collective bargaining representative of the pilots employed by that company. There was a collective bargaining agreement, which continues in effect. Edwards and Young are not members of the Association. On November 1, 1941, the active employment of Edwards was discontinued, and on June 1, 1942, Young's active employment ceased, both under circumstances to be discussed. Subsequently, Edwards and Young (the latter almost immediately) went on active duty with the armed forces of the United States. They were honorably discharged and applied to Capital for reemployment in 1945. The company employed them the same year, reinstating them upon the pilots' seniority list with seniority dating back in each case to the date of original employment. Since that date, both have been promoted from co-pilots to captains.

Other pilots contested the reinstatement of Edwards and Young on the seniority list. Individual protests were filed, and the Association presented a group protest. When the company upheld the seniority of Edwards and Young, the Association invoked the aid of the System Board of Adjustment, established pursuant to Section 204 of the Railway Labor Act.[2] The Board held that Edwards and Young were not in fact employees of the company at the time they entered the armed services, and it concluded that their seniority should be "established in relation to" the date they returned to Capital. Pursuant to that decision, Capital proposed to reduce the seniority of both appellants. These proceedings followed. The trial court found that the decision of the Board was final and binding on Capital and on the pilots, and that any rights Edwards and Young might

---

[1] Capital Airlines, Inc., is the successor corporation to Pennsylvania-Central Airlines Corporation, originally named as defendant. For clarity's sake, we refer to the airline throughout as "Capital" or simply "the company".

[2] 49 Stat. 1189, Act April 10, 1936, 45 U.S.C.A. § 184.

have had under the federal statutes relating to the reemployment of veterans "have been exhausted".

The pertinent provision of the Selective Training and Service Act[3] is that any person "who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer", shall be restored to the same or a like position without loss of seniority and shall not be discharged from such position without cause for one year. The question is whether Edwards and Young "left" their employment in order to perform military service. Both received written notices. Edwards' notice stated that due to reduction in schedules it was necessary to reduce co-pilot personnel, and concluded: "Each captain reduced to co-pilot status displaces two first officers, therefore it will be necessary to release eight or ten first officers. This will serve as notice to you that we will be unable to employ you as first officer after November 1, 1941." The notice to Young said, in part, "Due to the drastic curtailment of operations ordered by the Government, it is necessary that we are forced to release quite a number of personnel. This is to advise you that your services are no longer required after May 31, 1942."

Appellants contend that they were merely laid off; they insist that they were not "fired". They rely upon Fishgold v. Sullivan Corp.[4] But this position puts too much stress upon the expression "laid off". It is true that these appellants were not "fired" in the sense that that word means a discharge for cause. But a man may be permanently released without being "fired" in that sense. The Fishgold case dealt with a lay-off, but in the strict sense of that word, meaning a temporary cessation of work. A furlough and a leave of absence are both forms of lay-off, the Court said. Fishgold, following his discharge from the armed forces, had been restored to his old position. Within one year, temporary lay-offs became necessary because of a decrease in work at the employing shipyard. Fishgold was laid off on each of nine days during the spring. The Court said that he was not "discharged" but retained an employment status within the meaning of the statute.

The problem in the case at bar is not the mere meaning of the words "lay-off" or "fired". The question is whether the release of these men was complete, so that they were no longer in the employ of the company when they entered the armed service. We think that it was. The notices referred to "release". One said that the company would be "unable to employ you" after a designated date, and the other said "your services are no longer required". Those expressions denoted finality, in so far as the intention of the company at that time was disclosed. Appellants entered the armed services after these releases. They did not leave their employment "in order to perform such training and service". It is our view, therefore, that the above-quoted provisions of the Selective Training and Service Act did not apply to these appellants and so the company was not required by that statute to restore them to their prior seniority status.

This view of appellants' status after their release and before they returned to the company is confirmed by provisions in the contract between Capital and its employees. The pertinent provisions of the contract are:

"Sec. 23. Any pilot whose services with the Company are permanently severed shall forfeit his seniority right."

"Sec. 27.(a) A pilot who is released from the service of the Company due to reduction in force and who is subsequently reemployed shall retain his seniority to the time of release but shall not continue to accrue seniority after release unless and until he is reemployed. Such pilot, if he keeps the Company advised of his address, will be reemployed in the order of his seniority, provided the Company finds his flying ability and physical condition still meet the required standards. The right of

[3] Sec. 8(b) of Act of Sept. 16, 1940, 54 Stat. 890, as amended, 58 Stat. 798, Act Dec. 8, 1944, 50 U.S.C.A.Appendix, § 308.

[4] 1946, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230.

preference in reemployment shall expire at the end of one year from the date of release."

■ This Section 27(a) refers to retention of seniority and to preference in return to the employer's service. But, plainly, it contemplates that during the period of release from that service, the employee does not continue in the employment of the company. The section speaks of "reemployment". While it speaks of retaining seniority, it actually provides for a reinstatement of seniority upon reemployment. It contemplates that a pilot released due to reduction in force might never be reemployed. Only if and when he is reemployed does he resume his seniority status.

Appellants intimate, although they do not develop the point, that the status of a pilot released due to reduction in force is fixed by Section 27(a) of the contract as one of employment; that the language of their notices is the language of that section; and that the status thus determined was their status, within the meaning of the Selective Training and Service Act, at the time they joined the armed forces. But we are of the view, as we have said, that the status of one released due to reduction in force is fixed by Section 27(a) of the contract as one of unemployment.

Appellants next contend that quite apart from the statute they are entitled to seniority rights under the contract. Appellee company replies that the same contract which provided the seniority rights also provided that a decision of the System Board of Adjustment upon a dispute under the contract is final and binding upon the company and upon the employees.

Section 28(D) (5) of the agreement of April 20, 1940, between the company and the Association, which is the "Pilots Agreement", relating to working conditions "and a Procedure for the Orderly Settlement of Any Dispute", provided for an appeal to a System Board of Adjustment established by another agreement. Section (e) of the latter provided that the Board "shall have jurisdiction over disputes between any employee covered by the Pilots Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of the Pilots Agreement." And Section (l) provided that "Decisions of the Board in all cases properly referable to it shall be final and binding upon the parties hereto."

Appellants say that the decision of the Adjustment Board is not binding upon them, because they were not parties to the proceedings and because there was no provision for a voice representative of them in the Board's deliberations, i. e., "at the council table".

The facts as to the proceedings before the Board must be stated in some detail. When appellants reentered the company's employ after their service in the armed forces, the company gave them seniority from the date of their original employment, without interruption for the period of their absence. Eight protests were filed with the company by individual pilots whose seniority placements were affected by the reinstatement of appellants above them on the seniority list. A collective protest, signed by a number of pilots in the same situation as the individual protestants, was prepared by the Executive Council of the Association, signed by the protesting pilots, and filed. Then a formal "group grievance" was filed by the Association "as the duly designated local representatives of the air line pilots". This grievance alleged that the company had violated the Pilots Agreement by assigning seniority to these appellants "in apparent disregard of the rights of a large number of the pilot group." Proceedings were had, pursuant to the contract, before company officials. These preliminary proceedings consisted of a first hearing before a Mr. Trow Sebree, Director of Operations; a hearing upon a first appeal, this also before Mr. Sebree; and a decision on a second appeal, considered on the paper record, by the Executive Vice-President. In all these preliminary proceedings, the present appellants were in attendance and represented by counsel who entered an appearance in their behalf and participated by examining witnesses, etc. Considerable discussion was had concerning his status, but it was made plain that

his clients were not considered parties to the proceedings. Upon each of these three steps in the case, the company decided against the protesting pilots and in favor of appellants.

Thereupon the Association submitted the matter as a grievance case to the System Board of Adjustment. This Board, as we have said, was created by contract between the Association and the company, pursuant to a provision of the Railway Labor Act. It was composed of four members, "two (2) of whom shall be selected and appointed by the Association and two (2) by the Company". Appellants were not members of the Association, although they had applied for membership.

When the hearing before the Board was called, appellants and the attorney representing them were present, but appearances were formally entered by only two parties, the Association and the company. However, when the first witness was presented and had been examined in chief, the Chairman asked, "Mr. Markel [counsel for the present appellants], do you have any questions?", and this attorney examined the witness. Later this attorney offered an exhibit in evidence. A discussion ensued, and finally, in response to a question from the Chairman, the exhibit was submitted by the company as an exhibit on behalf of the company. Later, counsel for these appellants was permitted to raise a number of questions for the purpose of completing the record from his point of view. Some of his questions were answered, and some were not. He made a final statement to the Board. Records of the preliminary proceedings before company officials were made exhibits by reference in the Board proceedings. The decision of the Board was against these appellants and in favor of the claims of the protesting pilots.

From all the foregoing, it is apparent that appellants were not parties to the proceedings before the Board; they had no voice in the selection of members of the Board; the Association was a party to the proceedings and actively represented the interests of the protesting pilots; and appellants were present at the hearings, were represented by counsel, and participated by examining witnesses and presenting evidence.

We do not think that any right of appellants was denied merely because they were not parties to the proceeding in a formal sense. These were not narrowly formal proceedings. The facts are that these men were afforded every substantial right which they would have had had they been parties. They do not point to any omission of substance. They say they were not parties. But this is immaterial if every substantial element is present and only a bare technicality is missing.

But the further contention that the award made by this Board could not be final and binding upon these appellants, because the making of the award was in the hands of their active adversaries, presents a more difficult question. Even though the contract, negotiated by the union and the company, provided for such finality, was that provision valid as to minority employees in a contest with the union itself? While the union could well agree to bind itself to the awards of a board of four members, two of whom were union nominees, could it bind minority non-member employees in cases in which it actively pressed the interests of the member majority? In short, does not the non-member minority have a right to a court review of an award made in such a case by a board thus constituted?

Many types of grievances are, of course, by the employees against the employing company. The processes of negotiation and settlement are usually designed with those types in mind. There are grievances, however, notably as to seniority and as to promotions, which, while nominally against the company, are in fact by some employees against other employees. Usually, the company is a bystander in those cases. Whether the interests of a union, composed of all or a majority of the employees, is for one or the other of the contestants, depends in large measure upon the circumstances. If the question were between the last two men on the seniority list, the other employees, collectively, might conceivably be wholly neutral. But if the question

concerned a sizable group seeking placement at the top of the list, all the other employees might have strong views contrary to the minority. It does not seem that a union is compelled to take a position one way or the other in a contest which is in fact between two groups of employees, all of whom it nominally represents. It could take, in theory and in fact, a wholly neutral position in such a dispute and render its service as an impartial arbiter. At the same time, it is not unnatural that the officers of a union governed by majority rule should be controlled in their official actions by the strong interest of the majority. And in the case before us, the union did take a position in favor of the majority of the employees. In fact, it assumed the burden of presenting and pressing the claims of that majority. So our question is whether the decision of this System Board, constituted as it was, was final and binding upon these minority employees, non-members of the union, when the union itself was actively an adversary party.

We are of clear opinion that the award of the Board is entitled to presumptive weight of validity, and he who would upset it must bear a considerable burden. But it is also clear that the situation presented by the case before us is potentially extremely dangerous to the rights of the minority non-members. If the union were neutral in the dispute, that would be one thing. But where the union is aggressively presenting the interests of one group of employees and the company has no stake in the outcome, impartiality, protective of the rights of a non-member minority, could hardly be conclusively presumed.

This Board is not the Railway Adjustment Board, whose functions and power are fixed by the statute. This is a board created by contract. But the right to create it was reserved to the parties by the original Act,[5] and a duty to create it was imposed, by a later amendment, upon "every carrier and * * * its employees, acting through their representatives."[6] This gives it a public character that cannot be ignored.

The statute makes the awards of the National Adjustment Board "final and binding upon both parties to the dispute".[7] Nevertheless, the courts have indicated definite views that under some circumstances such awards are subject to judicial examination. This court, speaking through Mr. Justice Rutledge, indicated that thought in Washington Terminal Co. v. Boswell,[8] and the Circuit Court of Appeals for the Third Circuit did so in Dahlberg v. Pittsburgh & L. E. R. R.,[9] Steele v. Louisville & N. R. R.,[10] dealt with another phase of collective bargaining, the negotiation of a contract, but in the course of its opinion the Supreme Court discussed the grievance procedure and the Adjustment Board. It reflected the idea of a limitation upon the term "final and binding" and indicated its view that the awards of an Adjustment Board chosen in large part by those against whom the real complaint is made, are not immune from judicial scrutiny.[11] The Court also held in that case and in Tunstall v. Brotherhood[12] that a minority whose interests are not represented by a union, has rights derived from the statute and is without an adequate administrative remedy. In Elgin, J. & E. R. R. v. Burley,[13] the Supreme Court dealt with an award by the Adjustment Board. We need not relate the opinions in that case in detail. The problem there was different from the one here, and so the decision does

---

5 Sec. 3, Second, 44 Stat. 578, Act May 20, 1926, as amended, 45 U.S.C.A. § 153, Second.

6 Title II, Sec. 204, of the Act, 49 Stat. 1189, April 10, 1936, 45 U.S.C.A. § 184.

7 Sec. 3, subd. 1(m) of the Act, 48 Stat. 1189, June 21, 1934, 45 U.S.C.A. § 153, subd. 1(m).

8 1941, 75 U.S.App.D.C. 1, 124 F.2d

9 3 Cir., 1943, 138 F.2d 121.

10 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173.

11 Id., 323 U.S. 205–207, 65 S.Ct. 233–234, 89 L.Ed. 173.

12 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187.

13 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886, on rehearing, 1946, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928.

not control. But the Court made clear its view that Congress did not intend "to submerge wholly" the minority interests in grievance procedure.[14] It said: [15]

"In the view we take the Act guarantees to the aggrieved employee more than merely the right to be heard by the union and the carrier. * * * All of these provisions contemplate effective participation in the statutory procedures by the aggrieved employee.

"* * * the drastic effects in curtailment of his preexisting rights to act in such matters for his own protection would be most obvious in two types of cases: * * * the other, where the interest of an employee not a member of the union and the collective interest, or that of the union itself, are opposed or hostile."

And the decision in that case was that the mere appearance of a collective agent on behalf of an employee was not sufficient to render immune from judicial examination an award affecting his rights; that in some way, affirmative or otherwise, it must appear that the collective agent was authorized to act in the employee's behalf.

While none of these cases concerned the problem we have here, the tenor of the decisions is unmistakable. Even in a National Adjustment Board proceeding directly under the statute itself, the courts may look at the actualities of a dispute and the adjudication of it and will not be foreclosed by either assumptions or provisions that the collective agent acts in complete protection of the rights of each and every employee. We think that those views apply with equal force to the proceeding before us.

In the case at bar, we do not have a theoretical failure of the union to represent the interests of these appellants. We have an actual and bona fide conflict between the interests of a majority of the employees and the interests of these few. No criticism is to be leveled at the union for representing the interests of its majority. The difficulty is inherent in the situation.

Nothing in the foregoing leads to a conclusion that the award of the Board is invalid per se. And we are not of opinion that it is. But we are of opinion that under the combination of circumstances here present, these appellants have a right to have a court examine the award and the procedure from which it resulted.

■ The situation can be summarized in simple terms. All employees of a company have rights under a contract. A dispute arises between a few employees and the great majority of the employees concerning the rights of the few. The claims of the few are adverse to the interests of the majority. The company has no actual concern in the controversy one way or the other. The dispute goes for decision to a tribunal composed of two representatives of the company and two representatives of the union of the employees. The union assumes representation of the claims of the majority. The contract provides that the decision of this tribunal shall be final and binding. It also happens that the few employees are non-members of the union. The question is: Can the "final and binding" clause of the contract prevent the few employees (non-members of the union) from securing a judicial review of an adverse award made under this combination of circumstances? We must conclude, and we do, that it cannot. These appellants, in our view, had standing to bring these actions, and the court was required by their complaint to examine the validity of the award against them. Persons in their situation must have available to them, at some point, an impartial look at a decision, thus made, denying their claims to substantial rights. This is the time-honored function of an equity court. The general principle, applicable alike to judicial and to administrative determinations, is too well settled to require citation of authority. We think that the danger to the rights of the non-member few, clearly inherent in the combination of circumstances here present, calls for the application of that doctrine.

---

14 Id., 325 U.S. 733–734, 65 S.Ct. 1294–1295, 89 L.Ed. 1886.

15 Id., 325 U.S. 736, 65 S.Ct. 1296, 89 L.Ed. 1886.

We mean to make this decision no broader than the case. We are fully conscious that implications of more general doctrines seem to appear. But other holdings can await other cases. To emphasize the narrow limits of our present ruling, we point out that we are not dealing with a case where there was merely a dispute between a company and its employees, in which the union represented the employees; or with one in which the union assumed a bona fide neutral position in a dispute between employees. This case, we repeat for emphasis, concerns the rights of a few non-members of the union in a proceeding in which the union aggressively presented and pressed the claims of its members adverse to the claims of these appellant non-members, under a contract negotiated by the union, and before a board upon which two of the four members were union representatives. The nub of the question is whether such a contract can make the award of such a board in such a proceeding immune from judicial examination. We hold that it cannot.

■ We come then to consideration of the award itself. It is presumptively valid, but we are of clear opinion as to the status and rights of these appellants under the contract. It seems to us, as we have already said, that they fall within the provisions of Section 27(a) of the Pilots Agreement, as above quoted. If so, upon reemployment they retained their seniority as of the date of their release but did not accrue seniority during the period of their unemployment. We are not quite sure as to the exact purport of the conclusions of the Board upon the matter. The award as to Edwards was that his seniority placement be changed "so that his seniority is established in relation to his last date of employment, November 15, 1945." The award as to Young was similar. Whether "in relation to" contemplates no seniority as of the named date, or that seniority accrued to the date of release be picked up as of the date of reemployment without intervening accrual, we are not certain. We shall, therefore, remand the case for ascertainment of the precise meaning of the award. If the award means that as of the date of their reemployment these appellants resumed their seniority status as of the date of their release but without intervening accrual, it should be held valid and correct. If it has other meaning, it is to be declared invalid and the company directed to make the placements accord with the views here expressed.

Reversed and remanded with instructions.

### On Petition for Rehearing.

Upon petition for rehearing, Capital Airlines again urges a contention which it made in its briefs and oral argument. We thought we had made sufficiently clear our view upon the matter but add this word to our opinion lest it not be understood.

The contention is that Section 23 and not Section 27(a) of the contract applies to the appellants. The two sections read: "Sec. 23. Any pilot whose services with the Company are permanently severed shall forfeit his seniority right."

"Sec. 27.(a) A pilot who is released from the service of the Company due to reduction in force and who is subsequently reemployed shall retain his seniority to the time of release but shall not continue to accrue seniority after release unless and until he is reemployed. Such pilot, if he keeps the Company advised of his address, will be reemployed in the order of his seniority, provided the Company finds his flying ability and physical condition still meet the required standards. The right of preference in reemployment shall expire at the end of one year from the date of release."

■ One section treats of permanent severance and the other of release due to reduction in force. Obviously, there can be a permanent severance due to reduction in force. If the reduction in force is permanent, the severances due to it would be permanent. Also obviously, a reduction in force which at the time apparently will be permanent, may not prove to be so. The men released may be re-employed. The second section above quoted deals with appar-

ently permanent, as well as apparently temporary, releases when they are due to reduction in force. Given a release due to reduction in force and then later reemployment, that section reinstates the seniority lost by the severance. That is the situation of these appellants. The contract was not meant to permit the employer to release men upon a reduction in force and say to them, "This is permanent," and then, when circumstances change, reemploy them without seniority. The contract says that men released for that cause and then reemployed regain their seniority status.

Capital Airlines urges that our opinion is inconsistent in saying that the releases due to reduction in force resulted in a status of unemployment, and then saying that Section 27(a) of the contract applies. That section treats of release and reemployment. These men were released and so were unemployed; then they were reemployed. There is no inconsistency either in the contract or in our opinion.