ILLINOIS CENTRAL R. R. CO. *v.* NELSON.

March 3, 1952

No. 38109 57 So. 2d 321

*Jones & Stratton,* Brookhaven; *Jos. H. Wright, Chas. A. Helsell,* Chicago, Illinois; *L. E. Burch, Jr., J. E. Johnson, Jr.,* Memphis, Tennessee, for appellant.

*Wall & Allen,* Brookhaven; *Barnett, Jones & Montgomery,* Jackson, for appellee.

ROBERDS, P. J.

Nelson, in his declaration herein, alleged that in 1941 he was employed by appellant Railroad as a machinist, and that on May 13, 1946, the Railroad "wrongfully withdrew" him from the services, and he was "wrongfully deprived of the wages he would have earned from May 13, 1946, until he re-entered the service on November 29, 1946 * * *," and he asked for a money judgment for the wages he would have earned between May 13 and November 29. He says his suspension during that time was wrongful because he was superior in seniority to other employees who were retained in the service.

The Railroad defended on the grounds: (1) that the circuit court had no jurisdiction; that jurisdiction of this dispute was vested in the National Railroad Adjustment Board; (2) that Nelson was especially employed; that he was not within the class of machinist, and his suspension was proper; (3) that some four years prior to the institution of this action the controversy had been

compromised and adjusted and Nelson had accepted the benefits of that adjustment and had returned to work thereunder and was bound thereby, and (4) he had made no effort whatever to reduce his loss resulting from the suspension.

The trial judge peremptorily instructed the jury to return a verdict for Nelson, which was done, and judgment was entered for him in the sum of $1,774.80. The Railroad appeals. It urges here the same defenses made below, as above set out, and, in addition, says the jury should have been permitted to pass upon the question of fact as to whether Nelson was a machinist or was specially employed under a new classification as a specialist.

We will deal with and decide whether this was a dispute of which the National Railroad Adjustment Board had exclusive jurisdiction. This requires a somewhat detailed disclosure of the circumstances surrounding the employment, suspension and re-employment of Nelson.

In May 1941 this country was apprehensive of becoming engaged in the Second World War. There was a shortage of labor in the various departments of the Railroad. It conferred with officials of the local labor union at McComb, Mississippi. That union could not supply the labor deficiency, but it agreed that non-union labor might be employed under the emergency but such labor would be classed as specialists and not be in priority competition with the existing union employees. Word was broadcast that the Railroad needed laborers. Nelson was in the welding business at McComb. He had been doing welding for two local automobile dealers. He applied to Bell, master mechanic and general foreman of the Railroad. Bell says he explained to Nelson his employment would be temporary and he would be classed as a specialist. Nelson's testimony may be construed as a denial of that. Nelson made application for employment as "Machinist Welder * * * in Mechanical Department." He was put to work. He says he was a

machinist. Appellant's testimony is he was a welder in the machinist department—not a machinist.

Rule 32 of the Schedule of Rules of System Federation No. 99, Railway Employees' Department, A. F. of L., which embraces rules covering machinists, of which craft Nelson claims to have been a member, and on which rules and regulations he bases his suit, requires the employer to publicly post on January first of each year the seniority list of each craft, and "Unless a written protest is made by men in active service within thirty (30) days from date of posting seniority list, dates shown thereon will not thereafter be changed." Appellant posted such notice January 1, 1942, and Nelson was designated thereon as a "welder." He made no protest.

In November 1942 Nelson was drafted into the army. He was discharged October 11, 1945. Each year while in the army he was described on the posted roster as a specialist. In his discharge papers he described his occupation as that of "welder combination."

On November 28, 1945, he made application to appellant Railroad for active duty. He asked for work as "Mach. Welder," and, in describing his former occupation with the Railroad, he said he had worked as "Mch. Welder." He was put back to work. He says he was a combination machinist and welder. Members of the local union and Railroad employees say he did welding in the machinist department, specifically in the Reclamation Plant. In his labor report slips Nelson described his work as that of "Mchn. Welder."

We should add here that some thirty laborers were given employment at McComb under conditions similar to those under which Nelson was originally employed.

Along about the time Nelson was put back to work the regular union machinists became apprehensive these specialists might undertake to supplant, or contest, their seniority rights. On February 26, 1945, Lorenzo Davis, J. T. Lyons, Jas. I. Givens, Local Shop Committee I. A.

of M., at McComb, wrote A. D. Haley, Master Mechanic of the Railroad, the following letter:

"It was the understanding of shop committee of Local No. 1343 I. A. of M. when we were called upon and agreed to the employing of Automobile mechanics, and other so-called mechanics, that they would be machinist specialist, it was also agreed to by these men they would not have any right to machinist craft, other than the job that they were hired to perform, and a waiver was signed by these men to this effect.

"Due to the fact that it never was agreed as to were (sic) these men would be placed on seniority roster, we the present committee of local No. 1343 are requesting you to have a separate seniority list for Machinist Specialist, placing these men on list in order that they were employed.

"The reason for this change is to avoid any argument when such time comes that we will have to start suspending these men, as the present seniority roster stands, we would be compelled to cut off machinist that have served a four year apprenticeship, where they come in between specialist, as they now are on our machinist roster, the only way to correct this is to have a separate roster for Mach. specialist.

"Hope this will meet with your approval and that you will give this request your immediate attention, we remain, * * *."

Mr. H. L. Hunter, who resided at Paducah, Kentucky, and who was President and General Chairman of District No. 21, I. A. of M., which District included McComb, came to McComb, investigated the situation, and conferred with the officers of the local union and officials of the Railroad. On April 30, 1945, Mr. Hunter, as such General Chairman of District No. 21, and the above named Local Committee of the Union at McComb, again wrote Haley, Master Mechanic of the Railroad, suggesting that these specialists sign a waiver of any claims to

seniority as machinist, enclosing a prepared form for that purpose, saying if any refused to sign the Union would take steps to remove them from employment. The letter further asserted that these specialists were not machinists and not entitled to seniority as such and that it was the understanding they would not be placed upon the seniority roster "but were to work for the duration of our war emergency to relieve the man shortage." The letter also stated "Our International Officers are aware that this condition exists and have so advised that the whole matter be corrected as soon as possible to prevent any trouble when business should slacken and it will be necessary to furlough some men."

On May 13, 1946, a coal strike existed; it was necessary that some laborers be relieved of work. Nelson was one of these. However, he says he was a machinist and that the Railroad wrongfully suspended him when he had a priority over certain machinists who were not suspended. He described that situation in these words in his declaration, "Defendant withdrew him from service on May 13, 1946, and retained in the service machinists who were younger in service than the plaintiff as a machinist, all in violation of plaintiff's contract with the defendant."

Nelson contacted an attorney at McComb in an effort to get reinstated in active duty. This attorney wrote the Railroad on behalf of Nelson and several others similarly situated. In November 1946 a meeting was had at McComb between this attorney, the Railroad attorneys and officials of the National and local Labor Unions. As a result of this meeting an agreement was reached, which was reduced to writing. It recites that the specialists were removed from the machinist roster on request of the International Association of Machinist because they, the specialists, did not possess the qualifications of machinist; that the attorney for the specialists would recommend to his clients that their names be placed upon

the machinist roster as machinists, with seniority dates as shown on the roster posted January 1, 1946. The Railroad agreed to give the specialists notice that their names would be placed upon the roster as machinist and would be called for work as their seniority dates entitled them, and that upon their return to work the Railroad would give them instruction "in the various phases of the recognized work of machinist and their employment will not be jeopardized by reason of the fact that they were not capable of performing all classes of machinists' work," and the Railroad would issue to them journeyman machinist cards. The specialists agreed to make no claim for compensation during the time they had been suspended, and the Railroad agreed to pay the fees of their attorney. Nelson did not sign that agreement. He admits he talked with the attorneys in an effort to get reinstated, but says he did not empower them to bring suit. As a matter of fact, no suit was brought until the present suit was instituted some four years later. However, Nelson admits he knew of the meeting and of the agreement; that Bell wrote him about it November 19, 1946; he then made application for re-employment, and that Bell again wrote him to report November 29, 1946, which he did and was then given employment, which had continued to the date of the trial, and, so far as this record discloses, he is yet so employed.

It is pertinent to this question of jurisdiction to say that the Rules of the Union do not define a welder. Rule 34 does say that none but mechanics and their apprentices shall operate certain types of welding machines, but it contains no definition of the qualifications of a welder. The constitution of the Union defines a specialist in these words: "A specialist is a person who is employed in some branch or subdivision of the machinists' trade, or a person who performs some particular line of work commonly recognized as work connected with the machinists' trade or the metal industry."

The qualifications of a machinist are defined by Rule 60 as follows: "Any man who has served an apprenticeship or has had four (4) years experience at the machinists' trade and who, by his skill and experience, is qualified and capable of laying out and fitting together the metal parts of any machine or locomotive, with or without drawings, and competent to do either sizing, shaping, turning, boring, planing, grinding, finishing, or adjusting the metal parts of any machine or locomotives, shall constitute a machinist." Rule 61 sets out in detail in what a machinist's work shall consist, including the ability to use "oxy-acetylene, thermit and electric welding on work generally recognized as machinists' work," and many other types of mechanical work.

The question now recurs, Was this a matter of which the National Railroad Adjustment Board had jurisdiction?

It will be seen from the foregoing recital of facts and contentions that these, and conceivably other, questions are involved:

1. The Schedule of Rules of System Federation No. 99 do not provide for specialists. It appears the constitution of the Union does define that classification as above quoted. The suit is grounded upon the Rules. Is there such a classification as a specialist? Do the Rules cover that classification?

2. It is admitted Nelson had not had four years experience either as a machinist or a machinist apprenticeship, yet the foundation of his claim to compensation is grounded on the assumption he was a machinist with priority rights as such. Could he attain the status of a machinist by the special arrangement heretofore set out?

3. Could the National and Local Unions, in conjunction with the Railroad, by special agreement, confer upon him the status of a machinist when it is admitted he did not possess the requisite qualifications as such, as against those who did possess such qualifications?

4. It is contended, on the one side and denied on the other, that one hired as a specialist does not become a member of the Union, and has no priority rights whatever.

5. Rule 40 of the Schedule of Rules upon which the suit is brought provides "An employee entering the service, and remaining therein thirty (30) days, will thereby establish his competency." Nelson, after his first employment, remained in such service longer than thirty days. He says that he thereby established his competency and qualification and status as a machinist. A construction of this rule is necessary to determine that question.

6. This suit involves priority rights between Nelson and all the machinists employed by the Railroad at the time. These machinists are not parties to this suit. An adjudication of these priority rights by the National Railroad Adjustment Board would settle the question as between them. An adjudication of this question by the Court would not be binding upon the machinists who are not parties hereto.

7. It appears from the record that there are other suits pending against this carrier by persons making substantially the same claim as Nelson. A ruling by the Board would settle the question; this suit does not do so.

8. This is more than a mere suit between two litigants. The questions involved affect the rights and powers of the National and Local unions and the construction of the Rules which they have adopted.

Section 151a of the Railway Labor Act, Chapter 8, Title 45, U. S. C. A. defines some of the purposes of that Act to be: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of

agreements covering rates of pay, rules, or working conditions.''

Subsections (i) and (j) of Section 153 provide:

''(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

''(j) Parties may be heard either in person, by counsel, or by other representatives, as they may respectively elect, and the several divisions of the Adjustment Board shall give due notice of all hearings to the employee or employees and the carrier or carriers involved in any disputes submitted to them.''

Subsequent sections empower the Board to make awards of money, accompanied by order to the carrier to make the award effective and pay the employee the money so awarded to him. If the carrier does not comply with the order the employee can go into the appropriate District Court of the United States to enforce payment thereof.

Appellee bases his right to maintain this suit upon Moore v. Illinois Central Railroad Co., 180 Miss. 276, 176 So. 593. That case was reversed and remanded; later transferred to the Federal District Court, retried and appealed to the Supreme Court of the United States and there affirmed. Moore v. Illinois Central Railroad, 312 U. S. 630, 61 S. Ct. 754, 85 L. Ed. 1089. However, we do not think the Moore case justifies this law action.

In the first place, the circumstances and issues there were substantially different from those involved in the case at bar. Moore brought a common-law action for breach of contract and for damages resulting from the breach. He considered and treated his contract and his relations with the carrier at an end. This Court said, "The appellant is not seeking to be restored to the appellee's employment, nor does his complaint involve any question of discipline or policy arising under the contract." Nor does it appear that the rights of any other parties were involved or affected. In the case at bar Nelson alleged he had been an employee of defendant for many years "his employment being governed by the Schedule of Rules governing the working conditions of machinists, boiler makers, carmen and associated craft * * *." That is a question in this case. There was no question that Moore's employment was so governed. Here Nelson does not really sue for damages. He sues for wages he would have earned under the contract had he not been suspended. He does not treat the contract and employment at an end. He is suing for compensation under the contract. He seeks to maintain the relation of employer and employee. And, further, as to the Moore case, subsequent cases have greatly restricted and narrowed its effect, as will be shown by the hereinafter quotations from these cases.

In Starke v. New York, Chicago & St. Louis R. Co., 180 Fed. 2d 569, plaintiff sued for damages for impairment of his seniority rights and restoration thereof. The Seventh Circuit Court of Appeals held that the court had no jurisdiction; that plaintiff's right, if any, arose under the contract and not under the Federal Act. That court said:

"But if this be not a valid distinction it appears certain that Moore has been overruled by subsequent decisions of the Supreme Court. See particularly Elgin,

Joliet & Eastern Railway Co. v. Burley, et al., 325 U. S. 711, 725, 65 S. Ct. 1282, 89 L. Ed. 1886.''

''An extraneous matter not shown by the complaint upon which plaintiff places such reliance in his statement that his grievance over the course of the years had been frequently brought to the attention of the officers of his bargaining representative and because of their refusal to act in his behalf he was cut off from access to the Railroad Adjustment Board. This assertion, however, if it had been alleged would not have strengthened plaintiff's cause for the reason that his remedy was not dependent upon action by the agency which represented the employees but he was entitled either personally or by attorney to present his grievance to the Adjustment Board where all the parties interested in the dispute are entitled to notice, hearing and to participate. See Elgin, Joliet & Eastern Railway Co., supra, 325 U. S. at pages 727 and 732, 65 S. Ct. 1282.''

In Order of Railway Conductors v. Pitney, 326 U. S. 561, 66 S. Ct. 322, 90 L. Ed. 318, there was a dispute as to which employee should do certain work. The question arose in a court having charge of the reorganization of the railroad. The Circuit Court of Appeals held that this was a question for the Railroad Adjustment Board. 145 Fed. 2d 351. On appeal the Supreme Court of the United States used this language:

''But Congress has specifically provided for a tribunal to interpret contracts such as these in order finally to settle a labor dispute. Section 3 First (i) 10A FCA title 45, S. 153 First (i) of the Railway Labor Act provides that disputes between a carrier and its employees 'growing out of * * * the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * may be referred * * * by either party to * * * the Adjustment Board.' The Board cannot only order reinstatement of the employees, should they actually be discharged, but it can

also under S. 3 First (o) and (p) grant a money award subject to judicial review with an allowance for attorney's fees should the award be sustained. Not only has Congress thus designated an agency peculiarly competent to handle the basic question here involved, but as we have indicated in several recent cases in which we had occasion to discuss the history and purpose of the Railway Labor Act, it also intended to leave a minimum responsibility to the courts * * *. The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue.''

In Slocum v. D. L. & W. R. R. Co., 339 U. S. 239, 70 S. Ct. 577, 94 L. Ed. 795, a dispute arose between two unions, each claiming certain jobs. No agreement was reached. The carrier filed suit for a declaratory judgment adjudicating which agreement covered the jobs. A motion was made to dismiss the suit for lack of jurisdiction. The motion was overruled and the judgment entered. The Supreme Court of the United States in Order of Ry. Conductors v. Pitney, 326 U. S. 561, 66 S. Ct. 322, 90 L. Ed. 318, among other things, observed that the National Railroad Adjustment Board was created to settle such disputes as this; that its members understand railroad problems and have had large experience in such matters. The court then used this language:

''Our holding here is not inconsistent with our holding in Moore v. Illinois Central R. Co., 312 U. S. 630, 85 L. Ed. 1089, 61 S. Ct. 754. Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor

Act does not bar courts from adjudicating such cases. A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide, and does not involve questions of future relations between the railroad and its other employees. If a court in handling such a case must consider some provisions of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the Board.

"We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive. The holding of the Moore case does not conflict with this decision, and no contrary inference should be drawn from any language in the Moore opinion. It was error for the New York courts to uphold a declaratory judgment interpreting these collective-bargaining agreements."

In ORC v. Southern Railway Co., 339 U. S. 255, 70 S. Ct. 585, 94 L. Ed. 811, there was a dispute between certain conductors and the railroad as to the carrier's obligation under a collective-bargaining agreement to give conductors extra pay for certain services. The court said:

"For reasons set out in the Slocum case, 339 U. S. 239, ante, 795, 70 S. Ct. 577, we hold that the South Carolina state court was without power to interpret the terms of this agreement and adjudicate the dispute. We discuss this case separately because it sharply points up the conflicts that could arise from the state court intervention in railroad-union disputes. After the railroad had sued in the state court, the union filed a petition for hearing and award before the Adjustment Board. The state court nevertheless proceeded to adjudicate the dispute. Sustaining the state court's action would invite races of diligence whenever a carrier or union preferred one form to the other. And if a carrier or a union could choose a court instead of the Board, the other party would be

deprived of the privilege conferred by S. 3 First (i) of the Railway Labor Act, 45 U. S. C. A. S. 153 First (i), FCA title 45, S. 153 First (i), which provides that after negotiations have failed 'either party' may refer the dispute to the appropriate division of the Adjustment Board.''

The question whether a collective-bargaining agreement between an employing railroad and the fireman's union may deal with the demotion of engineers to firemen, the calling of firemen for service as emergency engineers, necessitating an interpretation of the agreement, are matters for the Adjustment Board and not the courts. General Committee of Adjustment, B. L. E. v. Southern P. Co., 320 U. S. 338, 64 S. Ct. 142, 88 L. Ed. 85.

In Burke v. Union P. R. Co., (CA 10th Utah), 129 F. 2d 844, plaintiff brought an action to recover damages for alleged breach of contract, asserting that the defendant company had violated its seniority rights as a yard switchman; that he had been continuously discriminated against by defendant in favor of other employees junior in seniority to him. He demanded a determination of the amount of wages rightfully accruing to him for services he would have rendered had he been furnished employment to which his seniority rights entitled him but which had wrongfully been given to other employees with seniority rights junior to his. He asked for establishment of his seniority date as of the time he contended it should be established and for an injunction restraining the employer railroad from again interfering with his seniority rights. The court held it had no jurisdiction of this controversy.

We are of the opinion in the case at bar that the questions are so intricate and the rights of the National and Local Unions and their members, as well as those of plaintiff and defendant, are so intertwined and affected, depending upon the construction and interpretation of the rules and regulations of the Unions, and determina-

tion of their powers, and the effect of such interpretation upon the present and future policy of such Unions, that the lower court had no jurisdiction of these matters, and they should be determined by the Railroad Adjustment Board if determined at all.

This makes it unnecessary for us to pass upon any of the other questions raised in the case, all of which, we might say, being strongly persuasive, especially the contention that plaintiff accepted the terms of the settlement agreement and is bound thereby.

Reversed and dismissed.

*Hall, Lee, Kyle* and *Ethridge, JJ.,* concur.