TRIMM *v.* ILLINOIS CENTRAL RAILROAD COMPANY, et al.

No. 41963          November 13, 1961          134 So. 2d 446

*Knox W. Walker,* Gulfport, for appellant.

*Eaton, Cottrell, Galloway & Lang,* Gulfport, for appellee.

KYLE, J.

This case is before us on appeal by H. B. Trimm, Complainant in the court below, from a final decree of the Chancery Court of Harrison County, dismissing for lack of jurisdiction his bill of complaint and writs of attachment against the Illinois Central Railroad Company and others, seeking to recover from the defendant Railroad

Company severance pay in the sum of $9,909.76 alleged to be due and owing to the complainant by virtue of what is known as the "Washington Job Agreement" of May 21, 1936, and by virtue of an order of the Interstate Commerce Commission, entered in I.C.C. Finance Docket No. 15920 on January 16, 1952, providing for the rights of employees adversely affected by the creation of the New Orleans Union Passenger Terminal and the coordination of traffic facilities incident thereto.

The complainant filed his bill of complaint in the Chancery Court of Harrison County on June 10, 1960. In his bill the complainant alleged that he was employed by the defendant Railroad Company thereafter in various capacities, accumulating both company and job seniority, until April 16, 1954, when he transferred to the employ of the New Orleans Union Passenger Terminal, hereinafter referred to as the NOUPT; that he accepted a job with the NOUPT as an upgraded electrician, terminating all previous seniority with the Illinois Central Railroad, except those rights preserved to him by the Washington Job Agreement of May 21, 1936, and an order of the Interstate Commerce Commission entered on January 16, 1952, in Interstate Commerce Commission Docket No. 15,920, and the agreement assuring such rights between the NOUPT and the System Federation No. 99, Realroad Employees' Department, American Federation of Labor. The complainant further alleged that he continued to work in said position as an upgraded electrician for the NOUPT until on or about June 16, 1954, at which time he received notice from the NOUPT that his services as an upgraded electrician were terminated, and that he was being reduced and demoted to the position of electrician's helper; that, from that date, he performed the services of electrician's helper at the NOUPT until October 17, 1954, at which time the complainant's services as electrician's helper were terminated, the work load and job content which

the complainant had theretofore performed being transferred and assigned to other employees classified as first class electricians.

The complainant further alleged that the reallocation, transfer and assignment of the work load and job content of electricians' helpers to first class electricians adversely affected the complainant in that it deprived him of wages and a job, and that the failure on the part of the defendant Railroad Company to pay the complainant coordination or displacement pay, was a breach of paragraph 1(c) and (d) and paragraphs 2 and 6 of the Labor Contract between the NOUPT and the System Federation No. 99, Railroad Employees' Department, American Federation of Labor, to which the defendant Railroad Company was a party, and Section 1 and Sections 5 and 6 (a), (b) and (c) of the Washington Job Agreement, and the order of the Interstate Commerce Commission entered in Docket No. 15920; and that the breach of the aforesaid agreements by the defendant Railroad Company gave rise to complainant's cause of action for which he prayed for relief.

The complainant further alleged that he had made a formal application for a coordination allowance at the time his services as an electrician's helper were terminated by NOUPT on October 17, 1954, and that said application was denied; that, after October 17, 1954, complainant was placed on a seniority list at the NOUPT as an electrician's helper; and that since that time he had worked approximately four months at the Terminal, the last period of employment having ended on or about September 16, 1958. The complainant alleged that the coordination of said terminal facilities, and the transfer and assignment of the work load and job content normally performed by electricians' helpers to employees classified as first class electricians, had deprived him of employment continuously since October 17, 1954, and as a result thereof complainant was entitled

to 48 months pay at the rate of 60 per cent of his average earnings at the time of his discharge by the defendant. The complainant therefore asked that a decree be entered ordering the defendant Railroad Company to pay to him the sum of $9,906.76, being the amount due and owing to him because of the defendant Railroad Company's breach of its contract.

In their answer the defendants denied that the complainant was entitled to any benefits from the defendant Railroad Company by virtue of either the Washington Job Agreement or the order of the Interstate Commerce Division or by virtue of any other agreement. In their answer the defendants averred that the complainant, on April 16, 1954, voluntarily transferred himself from the employment of the defendant Railroad Company to the employment of the New Orleans Union Passenger Terminal; that he was placed on furlough in October 1954 because of the cessation of the need for his services due to the termination of the air conditioning requirements of NOUPT, and not because of the coordination of activities into NOUPT; and that in October 1955, after a period of work in that year, he was again furloughed by NOUPT for the same reason. The defendants further stated in their answer that, after the complainant started working for NOUPT he was, at the insistence of the complainant's union, the International Brotherhood of Electrical Workers, reclassified as an electrician's helper; that this reclassification was effected for the reason that NOUPT was not a party to the upgrading agreement between the Railroad Company and the complainant's union. The defendant Railroad Company denied that the complainant had been adversely affected by the coordination of activities into the NOUPT, and denied that it was indebted to the complainant in any sums whatsoever.

As affirmative defenses the defendant Railroad Company asserted: (1) That the complainant was precluded

from maintaining his action in the Chancery Court of Harrison County by reason of the fact that he had, prior to the institution of his suit in the chancery court, on April 5, 1960, filed an identical claim with the National Railroad Adjustment Board, and that exclusive jurisdiction of the subject matter was vested in said Board; (2) that, in the alternative, sole jurisdiction to decide the dispute which constituted the subject matter of the complainant's claim was vested in a Disputes Committee as provided in Section 13 of the Washington Job Agreement, a copy of which was attached as Exhibit 1 to the defendants' answer, and that complainant had failed to avail himself of the administrative remedies therein provided; and (3) that, by virtue of Article V of a collective bargaining Agreement entered into between the defendant Railroad Company and the International Brotherhood of Electrical Workers, collective bargaining representative of the complainant, dated August 21, 1954, the complainant was required to pursue a claim based on a dispute of the nature set forth in his bill of complaint before an appropriate division of the National Railroad Adjustment Board within nine months from the date of the decision of the defendant Railroad Company denying such claim, and that the complainant's claim had been denied by the highest officer designated by the defendant Railroad Company to handle such disputes on June 20, 1958, more than nine months prior to the institution by the complainant of proceedings before the National Railroad Adjustment Board.

The complainant filed a response to the special defenses set up in the defendants' answer, to which he attached a copy of a motion which he had filed with the National Railroad Adjustment Board requesting a dismissal of his complaint before that body. In his response the complainant stated that his petition presented to the NRAB was untimely presented; that the

NRAB was without jurisdiction of the subject matter, because the complainant was no longer an employee of the defendant Railroad Company. The complainant also stated that the procedural remedy provided in Section 13 of the Washington Job Agreement was not an exclusive remedy; and that the complainant, at the time he filed his petition with the NRBA, had no knowledge of the administrative procedure prescribed in the collective bargaining Agreement referred to in the defendants' third affirmative defense.

Upon motion of the defendant Railroad Company the chancery court heard separately the special defenses set forth in the defendants' answer, which the defendant Railroad Company alleged were separate and distinct matters of defense and of themselves required a dismissal of the cause without further trial upon the bill and answer as a whole.

The defendant Railroad Company introduced in evidence during the hearing on the motion documentary evidence, as follows: (1) Copy of the Washington Job Agreement of May 21, 1936, which appeared as Exhibit 1 to the defendants' answer; (2) copy of the findings and order of the Interstate Commerce Commission dated January 16, 1952, in the matter of the New Orleans Union Passenger Terminal, Finance Docket No. 15920, providing protection under the Washington Job Agreement for the employees of the participating railroad companies who might be adversely affected by the coordination of said railroad facilities into a union terminal, which appeared as Exhibit 2 to the defendants' answer; (3) copy of Agreement Concerning Changes in Operations of the Railroads at New Orleans, dated April 10, 1953, signed by representatives of the several labor unions on behalf of the employees, and by NOUPT's terminal manager and representatives of the several railroads interested in the establishment of the union terminal; and (4) copy of Agreement and Memoran-

dum, dated August 21, 1954, between the railroads represented by the Eastern, Western and Southeastern Carriers' Conference Committees and the employees of such railroads represented by the Employees' National Conference Committee.

The Washington Job Agreement of 1936 was a collective bargaining agreement approved by approximately 87 per cent of the railroad carriers and 20 of the 21 railroad brotherhoods, and signed at Washington, D.C., on May 21, 1936. It contained a schedule of substantial financial benefits recommended for employees adversely affected by consolidations or so-called "coordinations" of railroad facilities. See Railway Labor Executives' Associations v. United States et al. (1950), 339 U. S. 142, 70 S. Ct. 530, and 94 L. Ed. 721. The Agreement contained the following provisions pertinent here:

"Section 1. That the fundamental scope and purpose of this agreement is to provide for allowances to defined employees affected by coordination as hereinafter defined, and it is the intent that the provisions of this agreement are to be restricted to those changes in employment in the Railroad Industry solely due to and resulting from such coordination * * *.

"     *     *     *

"Section 5. Each plan of coordination which results in the displacement of employees or rearrangement of forces shall provide for the selection of forces from the employees of all the carriers involved on bases accepted as appropriate for application in the particular case; and any assignment of employees made necessary by a coordination shall be made on the basis of an agreement between the carriers and the organizations of the employees affected, parties hereto. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13.

"Section 6(a) No employee of any of the carriers involved in a particular coordination who is continued in

service shall, for a period not exceeding five years following the effective date of such coordination, be placed, as a result of such coordination, in a worse position with respect to compensation and rules governing working conditions than he occupied at the time of such coordination so long as he is unable in the normal exercise of his seniority rights under existing agreements, rules and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at the time of the particular coordination * * *.

"(b) The protection afforded by the foregoing paragraph shall be made effective whenever appropriate through what is hereby designated as a 'displacement allowance' which shall be determined in each instance in the manner hereinafter described. Any employee entitled to such an allowance is hereinafter referred to as a 'displaced' employee.

"(c) Each displacement allowance shall be a monthly allowance determined by computing the total compensation received by the employee and his total time paid for during the last twelve (12) months in which he performed service immediately preceding the date of his displacement (such twelve (12) months being hereinafter referred to as the 'test period') and by dividing separately the total compensation and the total time paid for by twelve, thereby producing the average monthly compensation and average monthly time paid for, which shall be the minimum amounts used to guarantee the displaced employee, and if his compensation in his current position is less in any month in which he performs work than the aforesaid average compensation he shall be paid the difference * * *.

Section 7(a) Any employee of any of the carriers participating in a particular coordination who is deprived of employment as a result of said coordination shall be accorded in allowance (hereinafter termed a

coordination allowance), based on length of service, which (except in the case of an employee with less than one year of service) shall be a monthly allowance equivalent in each instance to sixty per cent (60%) of the average monthly compensation of the employee in question during the last twelve months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of the co-ordination. This coordination allowance will be made to each eligible employee while unemployed by his home road or in the coordinated operation during a period beginning at the date he is first deprived of employment as a result of the coordination and extending in each instance for a length of time determined and limited by the following schedule:

| Length of Service | Period of Payment |
|---|---|
| 1 year & less than 2 years | 6 months |
| 2 years ” ” ” 3 ” | 12 ” |
| 3 ” ” ” ” 5 ” | 18 ” |
| 5 ” ” ” ” 10 ” | 36 ” |
| 10 ” ” ” ” 15 ” | 48 ” |
| 15 years and over | 60 ” |

"  *  *  *

"(c) An employee shall be regarded as deprived of his employment and entitled to a coordination allowance in the following cases:

"1.   When the position which he holds on his home road is abolished as a result of coordination and he is unable to obtain by the exercise of his seniority rights another position on his home road or a position in the coordinated operation, or

2.   When the position he holds on his home road is not abolished but he loses that position as a result of the exercise of seniority rights by an employee whose position is abolished as a re-

sult of said coordination, or by other employees, brought about as a proximate consequence of the coordination, and if he is unable by the exercise of his seniority rights to secure another position on his home road or a position in the coordinated operation.

"(d) An employee shall not be regarded as deprived of employment in case of his resignation, death, retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to employees generally, dismissal for justifiable cause in accordance with the rules, or furloughed because of reduction in forces due to seasonal requirements of the service; nor shall any employee be regarded as deprived of employment as the result of a particular coordination who is not deprived of his employment within three years from the effective date of said coordination.

"* * *

"Section 9. Any employee eligible to receive a coordination allowance under Section 7 hereof may, at his option at the time of coordination, resign and (in lieu of all other benefits and protections provided in this agreement) accept in lump sum a separation allowance determined in accordance with the following schedule:

| Length of Service | Separation Allowance |
|---|---|
| 1 year & less than 2 years | 3 months' pay |
| 2 years " " " 3 " | 6 " " |
| 3 " " " " 5 " | 9 " " |
| 5 " " " " 10 " | 12 " " |
| 10 " " " " 15 " | 12 " " |
| 15 years and over | 12 " " |

"* * *

"Section 13. In the event that any dispute or controversy arises (except as defined in Section 11) in con-

nection with a particular coordination, including an interpretation, application or enforcement of any of the provisions of this agreement (or of the agreement entered into between the carriers and the representatives of the employees relating to said coordination as contemplated by this agreement) which is not composed by the parties thereto within thirty days after same arises, it may be referred by either party for consideration and determination to a committee which is hereby established, composed in the first instance of the signatories to this agreement. Each party to this agreement may name such persons from time to time as each party desires to serve on such committee as its representatives in substitution for such original members. Should the committee be unable to agree, it shall select a neutral referee and in the event it is unable to agree within 10 days upon the selection of said referee, then the members on either side may request the National Meditation Board to appoint a referee. The case shall again be considered by the committee and the referee and the decision of the referee shall be final and conclusive. The salary and expenses of the referee shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them."

The above mentioned Agreement concerning changes in operations of the railroads at New Orleans, dated April 10, 1953, was an agreement governing the assignment of positions on the new Terminal to employees of the signatory carriers who were transferred to the NOUPT, and providing for the establishment of seniority rosters on the Terminal for each craft or class of employees. Section 6 of the Agreement provided that the acceptance of employment on the Terminal should not constitute a waiver of protective conditions for employees who may have been adversely affected as the result of the coordination. Section 7 of the Agreement provided that all conditions for the protection of em-

polyees contained in the Order of the Interstate Commerce Commission dated January 16, 1952, should be applied to all employees of the signatory carriers who might be adversely affected by the involved coordination, without prejudice to the position of any party with respect to the Washington Job Agreement of May 21, 1936.

The Agreement and Memorandum, dated August 21, 1954, between the railroads represented by the Eastern, Western and Southeastern Carriers' Conference Committees and the employees represented by the Employees' National Conference Committee, referred to in the pleadings as an Agreement between the defendant Railroad Company and the International Brotherhood of Electrical Workers, was a collective bargaining agreement providing among other things a method for the handling of claims or grievances of employees against the signatory carriers. Article V of that Agreement provided as follows:

"* * *

"The following rule shall become effective January 1, 1955:

"1. All claims or grievances arising on or after January 1, 1955, shall be handled as follows:

"(a) All claims or grievances must be presented in writing by or on behalf of the employee involved, to the officer of the Carrier authorized to receive same, within 60 days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the carrier shall, within 60 days from the date same is filed, notify whoever filed the claim or grievance (the employee or his representative) in writing of the reasons for such disallowance. * * *.

"(b) If a disallowed claim or grievance is to be appealed, such appeal must be in writing and must be taken within 60 days from receipt of notice of disallowance, and the representative of the Carrier shall be

notified in writing within that time of the rejection of his decision. * * *.

(c) The requirements outlined in paragraphs (a) and (b), pertaining to appeal by the employee and decision by the Carrier, shall govern in appeals taken to each succeeding officer, except in cases of appeal from the decision of the highest officer designated by the Carrier to handle such disputes. All claims or grievances involved in a decision by the highest designated officer shall be barred unless within 9 months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before the appropriate division of the National Railroad Adjustment Board or a system, group or regional board of adjustment that has been agreed to by the parties hereto, as provided in Section 3 Second of the Railway Labor Act * * *.

"2. With respect to all claims or grievances which arose or arise out of occurrences prior to the effective date of this rule, and which have not been filed by that date, such claims or grievances must be filed in writing within 60 days after the effective date of this rule in the manner provided for in paragraph (a) of Section 1 hereof, and shall be handled in accordance with the requirements of said paragraphs (a), (b) and (c) of Section 1 hereof * * *.

"* * *

"5. This agreement is not intended to deny the right of the employees to use any other lawful action for the settlement of claims or grievances provided such action is instituted within 9 months of the date of the decision of the highest designated officer of the Carrier."

The defendant Railroad Company also offered in evidence copy of petition of the complainant filed with the National Railroad Adjustment Board on April 5, 1960, seeking to recover from the defendant Railroad Company a coordination allowance under the provisions of

the Washington Job Agreement, and motion for a hearing on said petition; also copies of the defendant Railroad Company's response to said petition, and order of the National Railroad Adjustment Board dismissing said petition as requested by the complainant.

Two witnesses were called to testify on behalf of the defendant Railroad Company. C. J. Wallace, Manager of the New Orleans Union Passenger Terminal, testified that Trimm was still carried on the roster of employees of the NOUPT as an employee in the capacity of an electrician's helper with seniority bearing date of October 30, 1944, and that he was on furlough status at the time of the hearing. Wallace stated that Trimm had never resigned from the employment of the NOUPT, and had never been discharged from the employment of the NOUPT, although he had not been regularly employed at the NOUPT since October 17, 1954.

R. E. Lorentz testified that he was manager of personnel of the defendant Railroad Company, and in that capacity the highest officer designated by the defendant Railroad Company having authority to allow or deny the complainant's claim for coordination allowance resulting from his transfer from the defendant Railroad to the New Orleans Union Terminal. Lorentz then identified, and the defendant Railroad Company offered in evidence as an exhibit to Lorentz' testimony, without objection, copy of a letter dated June 20, 1958, written by Lorentz, as manager of personnel of the defendant Railroad Company, to E. L. Derington, General Chairman, International Brotherhood of Electrical Workers, 1325 South Wabash Avenue, Chicago 5, Illinois, denying the complainant's claim for coordination allowance or lump sum settlement.

The complainant offered no evidence on the issue presented by the Railroad Company's motion to dismiss the complainant's bill on the ground that the court had no jurisdiction to hear and determine the cause.

At the conclusion of the hearing on the motion, the chancellor stated that he was of the opinion that, under the authorities cited by the attorneys for the defendant Railroad Company, the Court was without jurisdiction to hear and determine the cause, and that the bill of complaint and writs of attachment issued thereon should be dismissed; and a decree was entered accordingly.

The appellant's attorney argues two points as ground for reversal of the decree of the lower court: (1) That it clearly appears from the language used in Section 3 of the 1934 amendment of the Railway Labor Act, 48 Stat. 1185, 45 U. S. C. Sec. 151, et seq., that Congress in conferring jurisdiction upon the National Railroad Adjustment Board intended to limit its jurisdiction over disputes between an employee or a group of employees and a carrier or carriers to cases in which it could be shown that the employment relation still existed; and that since the appellant was not an employee of the defendant Railroad Company at the time the right of action in his case accrued to him, the appellant had a right to bring his action for the recovery of severance pay in the courts of Mississippi, even though he had abandoned the administrative remedies provided in the collective bargaining Agreement of August 21, 1954; and (2) that the Washington Job Agreement of May 1936, did not provide an exclusive remedy for the settlement of claims for severance pay, and the collective bargaining Agreement between the Eastern, Western and Southeastern Carriers' Conference Committees and the employees of the railroads represented by the Employees' National Conference Committee, dated August 21, 1954, was not in force and effect at the time the appellant's right to severance pay accrued to him; and the appellant, therefore, had a right to resort to the courts for the enforcement of his demand, under authority of Moore v. Illinois Central Railroad Company, 312 U. S. 630, 61 S. Ct. 754. 85 L. Ed. 1089.

We think there was no error in the action of the trial judge in entering an order dismissing the complainant's bill on the ground that the court had no jurisdiction to hear and determine the cause.

This case in our opinion is controlled by the decisions of our own court in the case of Illinois Central Railroad Company v. Nelson (1952), 218 Miss. 896, 57 So. 2d 321, and the case of Illinois Central Railroad Company v. Bolton (1961), 240 Miss. 195, 126 So. 2d 524, and the decision of the Supreme Court of the United States in Pennsylvania Railroad Company v. Day (1959), 360 U.S. 548, 79 S. Ct. 1322, 3 L. Ed. 2d 1422.

In the case of Illinois Central Railroad Company v. Nelson, supra, the Court held that, where the questions involved in an employee's action against his employer Railroad to recover wages for a period of suspension allegedly violative of the employee's seniority rights were intricate, and the rights of national and local unions and their members, as well as those of the plaintiff and the defendant, were intertwined and affected, depending upon the construction and interpretation of rules and regulations of unions and the determination of their powers, and the effect of such interpretation upon the present and future policy of such unions, the circuit court had no jurisdiction and the matters would have to be determined by the Railroad Adjustment Board, if at all. Railway Labor Act, Secs. 2, 3, Subd. 1(i, j); 45 U.S.C.A., Secs. 151a, 153, Subd. 1 (i, j).

In the case of Illinois Central Railroad Company v. Bolton, supra, which was a suit against the railroad for an accounting and to recover wages allegedly wrongfully withheld from the plaintiff, the Court held that under the Railway Labor Act, Sec. 1 et seq., 45 U.S.C.A., Sec. 151, et seq., the Railroad Adjustment Board had exclusive jurisdiction of any grievance against the railroad for the termination of an employee's seniority rights upon a failure of the employee to respond to a

notice to return to work following a layoff and the employment of others having inferior seniority rights, and that the circuit court had no jurisdiction of the plaintiff's suit to recover wages lost as a result of the alleged violation of his seniority rights.

In Pennsylvania Railroad Company v. Day, supra, the record showed that following the rejection of a railroad employee's claim for extra compensation as a locomotive engineer, based on a collective bargaining agreement, the employee retired and thereupon sought to recover on the claim in a suit in the United States District Court for the District of New Jersey. The District Court stayed the proceedings awaiting the disposition of similar claims against the railroad then pending before the National Railroad Adjustment Board (145 F. Supp. 596), and an appeal from this interlocutory decision was dismissed. (243 F. 2d 485). Following a rejection by the National Railroad Adjustment Board of the claims against the railroad involving the same provisions of the collective bargaining agreement, the District Court dismissed the complaint on the ground that the board's interpretations were final (155 F. Supp. 695). The United States Court of Appeals for the Third Circuit reversed the judgment of the District Court. The Supreme Court granted certiorari, and upon review reversed the judgment of the Circuit Court of Appeals and remanded the cause in order that the case might be returned to the District Court with instructions to dismiss the complaint for lack of jurisdiction. The Court in that case held that, notwithstanding the employee's retirement from service, the National Railroad Adjustment Board had exclusive primary jurisdiction over the dispute arising under a collective bargaining agreement, and that the District Court properly dismissed the complaint.

In discussing the provisions of the Railway Labor Act of 1934, under which the National Railroad Adjustment Board was established, the Court in its opinion said:

"That Act, 48 Stat. 1185, 45 U.S.C., Sections 151 et seq., established a broad framework for the regulation and adjustment of industrial controversies involving railroads.

"The Act establishes, inter alia, the National Railroad Adjustment Board with the following purposes and functions:

" 'The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.' Railway Labor Act, Sec. 3, First (i), 45 U.S.C. Sec. 153, First (i).

" * * *

"The National Railroad Adjustment Board was established as a tribunal to settle disputes arising out of the relationship between carrier and employee. All the considerations which led Congress to entrust an expert administrative board with the interpretation of collective bargaining agreements are equally applicable when, as here, the employee has retired from service after initiating a claim for compensation for work performed while on active duty. The nature of the problem and the need for experience and expert knowledge remain the same. The same collective bargaining agreement must be construed with the same need for uniformity of interpretation and orderly adjustment of differences. There is nothing in the Act which requires that the em-

ployment relationship subsist throughout the entire process of administrative settlement. The purpose of the Act is fulfilled if the claim itself arises out of the employment relationship which Congress regulated. The Board itself has accepted this construction and adjudicates the claims of retired employees * * *.

"Since the Board has jurisdiction, it must have exclusive primary jurisdiction. All the considerations of legislative meaning and policy which have compelled the conclusion that an active employee must submit his claims to the Board, and may not resort to the courts in the first instance, are the same when the employee has retired and seeks compensation for work performed while he remained on active service. A contrary conclusion would create a not insubstantial class of preferred claimants. Retired employees would be allowed to bypass the Board specially constituted for hearing railroad disputes whenever they deemed it advantageous to do so, whereas all other employees would be required to present their claims to the Board * * *.

"Our decision in Moore v. Illinois Central R. Co., 312 U. S. 630, 85 L. Ed. 1089, 61 S. Ct. 754, does not stand in the way of this. The decision in that case has been given its proper, limited scope on Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 90 L. Ed. 795, 70 S. Ct. 577. Moore carved out from the controlling doctrine of primary jurisdiction the unusual and special situation of wrongful discharge where the aggrieved employee had been expelled from the employment relationship * * *.

"Our consistent regard for the importance of having disputes between railroad employees and carriers settled by the administrative Board which Congress established for that purpose requires respondent to resort to the NRAB for adjudication of his claim."

The appellant's argument in this case that, since he was not an employee of the defendant Railroad Company

at the time the right of action sued on accrued to him, he had a right to bring his action for the recovery of severance pay in the courts of Mississippi, we think, is fully answered by the Supreme Court in its opinion in the Day case, wherein the Court said: "All the considerations which led Congress to entrust an expert administrative board with the interpretation of collective bargaining agreements are equally applicable when, as here, the employee has retired from service after initiating a claim for compensation for work performed while on active duty."

The record shows that the appellant filed his petition for adjudication of his claim against the defendant Railroad Company with the NRAD on April 6, 1950, two months before the filing of his suit in the chancery court. The defendant Railroad Company filed a response to the appellant's petition, and in its response stated its reasons for rejecting the appellant's claim. The appellant then, without waiting for a decision by the Board, filed his motion asking that his petition be dismissed, assigning as his reason therefor that he had failed to prosecute his claim before the Board within the time specified in Article V of the collective bargaining Agreement of August 21, 1954, and that his failure to do so within the time specified was a bar to his petition. The appellant's motion to dismiss his claim was granted by a simple memorandum order of the Board, "Claim dismissed."

The appellant, in our opinion, had a right to dismiss voluntarily the proceeding which he had instituted before the NRAB, to avoid the effect of an adverse decision by that Board. But we think that the appellant's action in requesting a voluntary dismissal of his claim by the NRAB before a decision had been rendered by the Board, represented in no real sense a compliance with the requirement laid down by the Supreme Court in the Day case, wherein the Court said: "Our consis-

tent regard for the importance of having disputes between railroad employees and carriers settled by the administrative Board which Congress established for that purpose, requires respondent to resort to the NRAB for adjudication of his claim." A contrary conclusion would mean that employees in cases of this kind, would no longer be required to resort to the NRAB for adjudication of their claims, but would be permitted to withdraw their claims from the NRAB and resort to the state courts whenever they deemed it advantageous to do so.

' The appellant in this case does not claim that he was wrongfully discharged by the defendant Railroad Company; and the decision of the Court in the Moore case, supra, which is relied on by the appellant, is not applicable to the facts in this case. Illinois Central R. Co. v. Bolton, supra.

██ █ Whether the appellant was entitled to severance pay or other separation allowance as a result of the coordination of the New Orleans passenger terminal facilities, under the provisions of the Washington Job Agreement and the order of the Interstate Commerce Commission, and the collective bargaining Agreement of April 10, 1953, was a question which could be answered only after a determination of the relevant facts and a construction of the collective bargaining agreements upon which the appellant's claim is based; and that question in our opinion should have been left for determination by the NRAB, the specially constituted Board which Congress established for the handling of such disputes and the adjudication of such claims.

For the reasons stated above the judgment of the lower court is affirmed.

Affirmed.

*McGehee, C. J.,* and *Arrington, Ethridge* and *Rodgers, JJ.,* concur.