## SLOCUM, GENERAL CHAIRMAN, LACKAWANNA DIVISION NO. 30, ORDER OF RAILROAD TELEGRAPHERS, *v.* DELAWARE, LACKAWANNA & WESTERN RAILROAD CO.

No. 391. Argued February 8, 1950.—Decided April 10, 1950.

*Leo J. Hassenauer* and *Manly Fleischmann* argued the cause and filed a brief for petitioner.

*Pierre W. Evans* argued the cause for respondent. With him on the brief was *Rowland L. Davis, Jr.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Section 3 of the Railway Labor Act confers jurisdiction on the National Railroad Adjustment Board to hold hearings, make findings, and enter awards in all disputes between carriers and their employees "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . ."[1] The question presented is whether state courts have power to adjudicate disputes involving such interpretations when the Adjustment Board has not acted.

The respondent railroad has separate collective-bargaining agreements with the Order of Railroad Telegraphers and the Brotherhood of Railway Clerks.[2] A dispute arose between the two unions concerning the scope of their respective agreements. Each claimed for its members certain jobs in the railroad yards at Elmira, New York. The railroad agreed with the Clerks Union. The chairman of Telegraphers protested, urging reassignment of the work to members of his union and claiming back pay on behalf of certain individual members. The claims were pursued in "the usual manner" required by § 3 First (i) of the Railway Labor Act, 45 U. S. C. § 153 First (i), as a prerequisite to invoking jurisdiction of the Adjustment Board.[3] That section further provides that,

---

[1] 48 Stat. 1185, 1189–1193, 45 U. S. C. § 153.

[2] The full name of the latter union is Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees.

[3] "The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules,

"failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board . . . ."

Instead of invoking the jurisdiction of the Adjustment Board, the railroad filed this action for declaratory judgment in a New York state court, naming both unions as defendants. It prayed for an interpretation of both agreements, and for a declaration that the Clerks' agreement, not the Telegraphers', covered the jobs in controversy. It also asked for a declaration that the Telegraphers must refrain from making similar claims under its bargaining agreement. Telegraphers moved to dismiss the case on the ground that the Railway Labor Act left the state court without jurisdiction to interpret the contracts and adjudicate the dispute. That motion was denied. After a trial, the court interpreted the contracts as the railroad had urged, and entered the requested declarations. This judgment was affirmed by the Court of Appeals of New York, two judges dissenting. 299 N. Y. 496, 87 N. E. 2d 532.[4] The majority thought that our opinion in *Moore* v. *Illinois Central R. Co.*, 312 U. S.

---

or working conditions . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 48 Stat. 1191.

[4] The Appellate Division of the Supreme Court (3d Dept.) also affirmed both the order of the trial court denying the motion to dismiss, 269 App. Div. 467, 57 N. Y. S. 2d 65, and the subsequent judgment on the merits, 274 App. Div. 950, 83 N. Y. S. 2d 513. An opinion of the New York Supreme Court denying petitioner's motion to remove the action to the United States District Court is reported at 183 Misc. 454, 50 N. Y. S. 2d 313. The opinion of the United States District Judge remanding the case to the state court is reported in 56 F. Supp. 634.

630, left state courts free to adjudicate disputes arising out of a carrier-union collective agreement without obtaining the Board's interpretation of that agreement. The dissenting judges, however, relied on *Order of Conductors* v. *Pitney,* 326 U. S. 561, where we held that federal courts should not interpret such agreements prior to interpretation by the Adjustment Board. They asserted that this rule was also applicable in state courts. We granted certiorari to consider these questions. 338 U. S. 890.

The first declared purpose of the Railway Labor Act is "To avoid any interruption to commerce or to the operation of any carrier engaged therein." 48 Stat. 1186 (§ 2), 45 U. S. C. § 151a. This purpose extends both to disputes concerning the making of collective agreements and to grievances arising under existing agreements. See *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 722. The plan of the Act is to provide administrative methods for settling disputes before they reach acute stages that might be provocative of strikes. Carriers are therefore required to negotiate with bargaining representatives of the employees. *Virginian R. Co.* v. *Federation,* 300 U. S. 515, 547, 548. The Act also sets up machinery for conciliation, mediation, arbitration and adjustment of disputes, to be invoked if negotiations fail.

In this case the dispute concerned interpretation of an existing bargaining agreement. Its settlement would have prospective as well as retrospective importance to both the railroad and its employees, since the interpretation accepted would govern future relations of those parties. This type of grievance has long been considered a potent cause of friction leading to strikes. It was to prevent such friction that the 1926 Act provided for creation of various Adjustment Boards by voluntary agreements between carriers and workers. 44 Stat. 578. But this voluntary machinery proved unsatisfactory, and

in 1934 Congress, with the support of both unions and railroads, passed an amendment which directly created a national Adjustment Board composed of representatives of railroads and unions.[5]  48 Stat. 1189–1193.  The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements.  The Adjustment Board is well equipped to exercise its congressionally imposed functions.  Its members understand railroad problems and speak the railroad jargon.[6]  Long and varied experiences have added to the Board's initial qualifications.  Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems.

The paramount importance of having these chosen representatives of railroads and unions adjust grievances and disputes was emphasized by our opinion in *Order of Conductors* v. *Pitney, supra.*  There we held, in a case remarkably similar to the one before us now, that the Federal District Court in its equitable discretion should have refused "to adjudicate a jurisdictional dispute

---

[5] "These unadjusted disputes have become so numerous that on several occasions the employees have resorted to the issuance of strike ballots and threatened to interrupt interstate commerce in order to secure an adjustment.  This has made it necessary for the President of the United States to intervene and establish an emergency board to investigate the controversies.  This condition should be corrected in the interest of industrial peace and of uninterrupted transportation service.  This bill, therefore, provides for the establishment of a national board of adjustment to which these disputes may be submitted if they shall not have been adjusted in conference between the parties."  H. R. Rep. No. 1944, 73d Cong., 2d Sess. 3.

[6] For an interesting discussion of the Act's history and purposes, see Garrison, "The National Railroad Adjustment Board: A Unique Administrative Agency," 46 Yale L. J. 567 *et seq.*

involving the railroad and two employee accredited bargaining agents . . . ." Our ground for this holding was that the court "should not have interpreted the contracts" but should have left this question for determination by the Adjustment Board, a congressionally designated agency peculiarly competent in this field. 326 U. S. at 567–568. This reasoning equally supports a denial of power in any court—state as well as federal— to invade the jurisdiction conferred on the Adjustment Board by the Railway Labor Act.

Our holding here is not inconsistent with our holding in *Moore* v. *Illinois Central R. Co.*, 312 U. S. 630. Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor Act does not bar courts from adjudicating such cases. A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide, and does not involve questions of future relations between the railroad and its other employees. If a court in handling such a case must consider some provision of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the Board.

We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive.[7] The holding of the *Moore* case does not conflict

---

[7] We are not confronted here with any disagreement or conflict in interest between an employee and his bargaining representative, as in *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192. Nor are we called upon to decide any question concerning judicial proceedings to review board action or inaction.

with this decision, and no contrary inference should be drawn from any language in the *Moore* opinion. It was error for the New York courts to uphold a declaratory judgment interpreting these collective-bargaining agreements. The judgment of the New York Court of Appeals is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE REED, dissenting.

The Court denies "power in any court—state as well as federal—to invade the jurisdiction conferred on the Adjustment Board by the Railway Labor Act." It says "that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive." Read literally, this language would indicate that the Court holds that the Board in most cases not only has exclusive jurisdiction for the institution of proceedings to determine rights under railroad collective-bargaining agreements, but also for their final determination, *i. e.,* that there is no judicial review of the Board's awards, except those for money. The Court, however, in note 7 states that it is not "called upon to decide any question concerning judicial proceedings to review board action or inaction." From this I take it that the Court means only to hold that the Board has what might be called exclusive primary jurisdiction and that the decision is to have no implications for later cases which might pose the issue of judicial review of Board "action or inaction."[1]  Never-

---

[1] The sections of the statute which bear on appealability are 48 Stat. 1191, § 3 First (m) and (p). See *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, dissent, 761.

theless I think the Court's decision lacks statutory basis, and I dissent from its opinion and judgment.

Since the Court's decision will be referred to as a precedent for solving administrative jurisdiction problems, it seems worth while to set out my reasons for disagreeing with the Court's opinion. We can foresee only a part of the complications that this ruling of exclusive primary jurisdiction may bring into the administration of the Railway Labor Act. The determination of what adjudicatory body has power to judge a controversy is basic to all litigation. Jurisdiction that has always been recognized to exist in state courts should not be taken from them by inference drawn with difficulty from the statute by this Court after contrary conclusions by two state courts.[2] The passage of a federal law creating a forum for the enforcement of certain contract rights connected with commerce does not necessarily withdraw from state courts their recognized jurisdiction over these contract controversies. The purpose to limit enforcement to the federal forum must be found in the federal statute in express words or necessary implication.[3]

The Court calls attention to nothing to supply these requisites. There is not a line in the statute, and so far as I can ascertain, not a suggestion in the hearings that the creation of the Adjustment Board was intended by Congress to close the doors of the courts to litigants with otherwise justiciable controversies. The only expression in the statute which might conceivably support the Court is the general declaration of the Act's purpose "to provide for the prompt and orderly settlement of all disputes

[2] *Delaware, L. & W. R. Co.* v. *Slocum,* 299 N. Y. 496, 87 N. E. 2d 532; *Southern R. Co.* v. *Order of Railway Conductors,* 210 S. C. 121, 41 S. E. 2d 774. See also *Adams* v. *New York, C. & St. L. R. Co.,* 121 F. 2d 808.

[3] Cf. *United States* v. *Bank of New York Co.,* 296 U. S. 463, 479; see *Claflin* v. *Houseman,* 93 U. S. 130, 136.

growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." [4]   But this expression is as consistent with an intention to provide an alternative forum as to provide an exclusive one.   Experience has not demonstrated that the settlement of grievances has been any the less prompt and orderly in the courts than it has been in the Board. [5]

Neither the Act nor our precedents support the Court's ruling.   In the section which conferred jurisdiction on the Board, § 3 First (i), Congress provided that disputes "shall" be first handled by negotiations between the parties and on their failure "may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board . . . ." [6]   The use of "may"and "shall" in the 1934 Railway Labor Act may not be decisive, but I fail to see how it can now be disregarded completely, when at the time of *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630, the use of "may" seemed an indication of congressional purpose sufficient to furnish

---

[4] 48 Stat. 1187, § 2 (5).

[5] See Fifteenth Annual Report of the National Mediation Board, p. 12; Monograph of the Attorney General's Committee on Administrative Procedure, Part 4, Railway Labor, p. 16, S. Doc. No. 10, 77th Cong., 1st Sess. (1941).

[6] 48 Stat. 1191, § 3 First (i):

"(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

a ground for holding that courts had concurrent primary jurisdiction.[7]

The ruling in *Texas & Pac. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, does not support today's decision. In that case this Court held repugnant to the Interstate Commerce Act a suit in a state court to recover unreasonable carrier charges. The Act had given the Commission power to determine the reasonableness of rates filed and published under its provisions. It also prohibited explicitly preferences and discriminations in favor of shippers. The Court held that, if a shipper could recover in the courts part of a tariff charge, he would receive a discriminatory preference. Since this would be wholly inconsistent with the Interstate Commerce Act, state courts were without jurisdiction to entertain suits for the recovery of unreasonable charges.[8] By necessary inference

---

[7] 312 U. S. 630, 635–36: "It is to be noted that the section pointed out, § 153 (i), as amended in 1934, provides no more than that disputes 'may be referred . . . to the . . . Adjustment Board . . .' It is significant that the comparable section of the 1926 Railway Labor Act (44 Stat. 577, 578) had, before the 1934 amendment, provided that upon failure of the parties to reach an adjustment a 'dispute shall be referred to the designated Adjustment Board by the parties, or by either party . . .' This difference in language, substituting 'may' for 'shall,' was not, we think, an indication of a change in policy, but was instead a clarification of the law's original purpose. For neither the original 1926 Act, nor the Act as amended in 1934, indicates that the machinery provided for settling disputes was based on a philosophy of legal compulsion. On the contrary, the legislative history of the Railway Labor Act shows a consistent purpose on the part of Congress to establish and maintain a system for peaceful adjustment and mediation voluntary in its nature."

[8] 204 U. S. 426, 440–41: "For if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to

the Commission was found to have the sole power to entertain originally proceedings which might result in the alteration of an established schedule. But the Court was careful to say that a statute was not to be construed as taking away a common-law right unless it were found that it was "so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy." [9] The Railway Labor Act has no rule of law, similar to that against preferences, that would be controverted if different courts in different states should construe identical collective-bargaining agreements differently. If, to preserve uniformity in the rulings of the Board, it were necessary that it have exclusive primary jurisdiction over grievance disputes, Congress would hardly have provided, as it did, that carriers and railroads by agreement might set up system and regional boards independent of the National Board.[10] The *Abilene* case was pressed by four dissenters as controlling authority

---

consider the subject as an original question. Indeed the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed."

[9] 204 U. S. 426, 436–37: "As the right to recover, which the court below sustained, was clearly within the principles just stated, and as it is conceded that the act to regulate commerce did not in so many words abrogate such right, it follows that the contention that the right was taken away by the act to regulate commerce rests upon the proposition that such result was accomplished by implication. In testing the correctness of this proposition we concede that we must be guided by the principle that repeals by implication are not favored, and indeed that a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the preëxisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

[10] 48 Stat. 1193, § 3 Second.

250

to compel the conclusion that the Board had exclusive jurisdiction in *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711.[11]  But on the tacit assumption that courts were not ousted of their jurisdiction, we upheld the right of employees to sue the carrier although the employment relationship still existed.

The case before us is quite different from *Switchmen's Union* v. *Mediation Board,* 320 U. S. 297, and *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323.  Those concerned controversies of a kind unfamiliar to courts, and they involved the Mediation Board, which could impose sanctions only when the parties agreed to accept its awards.[12]  We held that the issues in those cases were not justiciable in the federal courts, since the "concept of mediation is the antithesis of justiciability." [13]  Here, the controversy relates to the interpretation of contracts, a function courts have always performed, and "it is not

---

[11] 325 U. S. 711, dissent, 759.  The dissenters insisted, p. 760: "The considerations making for harmonious adjustment of railroad industrial relations through the machinery designed by Congress in the Railway Labor Act are disregarded by allowing that machinery to be by-passed and by introducing dislocating differentiations through individual resort to the courts in the application of a collective agreement."

[12] 48 Stat. 1195, § 5 First; 44 Stat. 584, § 8.

[13] *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323, 337.  Not long after these decisions were handed down we explained them as follows: "This result was reached because of this Court's view that jurisdictional disputes between unions were left by Congress to mediation rather than adjudication.  320 U. S. 302 and 337.  That is to say, no personal right of employees, enforcible in the courts, was created in the particular instances under consideration.  320 U. S. 337.  But where rights of collective bargaining, created by the same Railway Labor Act, contained definite prohibitions of conduct or were mandatory in form, this Court enforced the rights judicially.  320 U. S. 330, 331.  Cf. *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548; *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515." *Stark* v. *Wickard,* 321 U. S. 288, 306–307.  See *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 207.

to be lightly assumed that the silence of the statute bars from the courts an otherwise justiciable issue." [14]

Nor did *Order of Railway Conductors* v. *Pitney*, 326 U. S. 561, determine the present jurisdictional issue. In a federal bankruptcy court handling a railroad reorganization, an interpretation of a collective-bargaining agreement was sought. We declared that the federal equity court should "exercise equitable discretion to give [the National Railroad Adjustment Board] the first opportunity to pass on the issue." [15] Thus we determined only that under the circumstances of that case the District Court, as a matter of discretion, should have remanded to the Board a controversy over the meaning of the collective-bargaining agreement, and at the same time should have retained jurisdiction to apply the Board's interpretation to the controversy. There was no intimation that the obligation to send the controversy to the Board was any more universal than the obligation of an equity court to sometimes remit parties to the state courts for a preliminary decision on state law. [16] There was no ruling that Congress had deprived the District Court of jurisdiction. Today the Court is compelled to extend the *Pitney* precedent from "discretion" to "jurisdiction" because federal courts lack power to order state courts to exercise in a particular manner their equitable discretion. But the Court's inability to secure a flexible rule does not warrant the Court to impose on the state courts a rigid one.

Congress surely would not have granted this exclusive primary power to adjudicate contracts to a body like the Board. It consists of people chosen and paid, not by the Government, but by groups of carriers and the

---

[14] *Stark* v. *Wickard*, 321 U. S. 288, 309.

[15] *Order of Railway Conductors* v. *Pitney*, 326 U. S. 561, 567.

[16] *Ibid.*; cf. *Propper* v. *Clark*, 337 U. S. 472; *Meredith* v. *Winter Haven*, 320 U. S. 228.

large national unions.[17]   Congress has furnished few pro-
cedural safeguards.   There is no process for compelling
the attendance of witnesses or the production of evidence.
There is no official record, other than that of the informal
pleadings.   Hearings are conducted without witnesses.[18]
The Board has operated without giving individuals a
chance to be heard unless they were represented by
unions.[19]

Throughout this opinion I have assumed that the
Court means only to impose a requirement of primary
recourse to the Board.   But that inevitably means many
litigants would be deprived of access to the courts.   The
extent of judicial review of awards other than money
awards is doubtful, and it is highly questionable whether
even a money award can be reviewed in the courts if
only the carrier wishes review.[20]   Most important, the
statute provides no relief for a petitioning party—be he
union, individual or carrier—against an erroneous order
of the Board.[21]   This Court may be hard put to protect
the rights of minorities under these circumstances.[22]

Nevertheless the Court says that Congress has forced
the parties into a forum that has few of the attributes

---

[17] 48 Stat. 1189, § 3 First (a) (b) (c) (g).

[18] Monograph, n. 5, *supra*, pp. 11–14; see Garrison, National Rail-
road Adjustment Board, 46 Yale L. J. 567, 576 *et seq.*

[19] Monograph, n. 5, *supra*, p. 7.

[20] See *Washington Terminal Co.* v. *Boswell*, 75 U. S. App. D. C. 1,
12, 124 F. 2d 235, 246; affirmed by an equally divided court, 319
U. S. 732.

[21] 48 Stat. 1191, § 3 First (m) and (p).   Garrison, National Rail-
road Adjustment Board, 46 Yale L. J. 567, 591.

[22] See *Tunstall* v. *Brotherhood of Locomotive Firemen*, 323 U. S.
210; *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 206.   Compare
*Howard* v. *Thompson*, 72 F. Supp. 695; *State ex rel. St. Louis-S. F.
R. Co.* v. *Russell*, 358 Mo. 1136, 219 S. W. 2d 340; *Edwards* v. *Capital
Airlines*, 84 U. S. App. D. C. 346, 350, 176 F. 2d 755, 759 *et seq.*   Cf.
*Shields* v. *Utah Idaho R. Co.*, 305 U. S. 177.

of a court, but which may be the final judge of the rights of individuals. Our duty as a court does not extend to a determination of the wisdom of putting a solution of industry problems into the hands of industry agencies so far as the Constitution will permit.[23]  Some may deem it desirable to weld various industries or professions into self-governing forms, completely free from judicial intervention.  This desire may spring from a conviction that experience and training in highly specialized fields give the members of a group that understanding and capacity which will enable them to govern their internal affairs better than would courts dealing with the generality of human relations and only occasionally with these specialized controversies.  Congress, however, has never completely so isolated an industry from the rest of the Nation.  There is too much interrelation and interdependence between such groups and the rest of the population.  In some instances the Congress has given great sweep to agencies in some fields.  Even special courts have been created, such as the Court of Customs and Patent Appeals.  When Congress has created these administrative agencies and special courts, it has carefully outlined their powers, provided stated protections for individual rights, and has furnished neutral officials. But here, although none of these protections have been provided, the Court finds an underlying purpose in Congress to abolish, without discussion, judicial jurisdiction.

When an administrative body varies so markedly from the kind which experience has shown may safely be given final power over people's rights, it should not be assumed that Congress intended the primary jurisdiction of the Board to be exclusive.  A more definite expression is required.  The decision of the Court places it in a dilemma

[23] See *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 284; *Ng Fung Ho* v. *White,* 259 U. S. 276.

of its own creation—it must in the future build up a complex system of review, or it must say that Congress intended to leave the rights of many individuals and organizations to the unreviewable discretion of a privately selected board.  By giving effect to the plain words of the statute which confer on the Board a jurisdiction only concurrent with the courts, we should avoid the necessity for judicial legislation in unexplored areas of the law.  If unseemly results should follow, the legislative body would have the facilities to undertake the important and extensive task of deciding what should be the proper distribution of authority between courts and administrative bodies in connection with railroad labor relations.  Courts should await specific legislative direction instead of reading into a statute a purpose to transfer jurisdiction from state courts to a federal board.