James A. **GAINEY** and J. L. **Young**, Individually and on Behalf of Others Similarly Affected, Appellants,

v.

The **BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES** and the **Pennsylvania Railroad Company.**

No. 13896.

United States Court of Appeals Third Circuit.

Argued Oct. 16, 1962.

Decided Jan. 14, 1963.

See also 303 F.2d 716.

Lawrence J. Richette, Philadelphia, Pa., for appellant.

Allen S. Olmsted, Philadelphia, Pa. (Walter Biddle Saul, Saul, Ewing, Remick & Saul, Philadelphia, Pa., Leonard D. Slutz, Ivar H. Peterson, Cincinnati, Ohio, on the brief), for appellee Union.

Robert M. Landis, Philadelphia, Pa. (Dechert, Price & Rhoads, Philadelphia, Pa., Richard N. Clattenburg, Philadelphia, Pa., on the brief), for appellee Railroad.

Before McLAUGHLIN and HASTIE, Circuit Judges, and DUMBAULD, District Judge.

McLAUGHLIN, Circuit Judge.

This is an appeal from the granting of motions to dismiss the complaint in favor of the defendants Pennsylvania Railroad Company (Railroad) and Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees (Brotherhood). Plaintiffs bring this action on behalf of themselves and some six hundred other railroad employees against the Railroad and the Brotherhood, their statutory representative, charging both with violations of the Railway Labor Act, 45 U.S.C. § 151 et seq.

The same parties were before this court recently on appeal from a similar order dismissing plaintiffs' complaint. Gainey v. Brotherhood of Railway and Steamship Clerks, 275 F.2d 342 (3 Cir.), cert. denied, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960). In that case we affirmed the judgment of the district court, 177 F.Supp. 421 (E.D.Pa.1959), and held regarding plaintiffs' cause against the Railroad that (1) primary jurisdiction of the dispute was in the National Railroad Adjustment Board, not in the courts, and (2) basically the claim was founded on an alleged "equalization of pay agreement" which, contrary to their contention, had never been consummated. Plaintiffs' complaint against the Brotherhood was dismissed for a failure to allege the exhaustion of their internal union remedies or an adequate reason for failure to do so. Subsequently, plaintiffs filed another complaint in the district court. That was also dismissed as to both defendants on the ground that the facts alleged were identical to those in the prior action and for similar reasons the complaint should be dismissed. This appeal is from that order.

A comparison of the two complaints is necessary to an understanding of the issues now raised. In their first complaint plaintiffs stated that they were "tallymen" employed by the Railroad in its Eastern Region. Under a collective bargaining agreement entered into between the Railroad and the Brotherhood on May 1, 1942 plaintiffs were paid an hourly wage plus a bonus based on freight moved over a certain minimum tonnage. The rate of pay under this "tonnage agreement" was about $25 less than that of their counterparts in the Central Region, who were paid by salary and enjoyed paid vacations and sick leave. The geographical pay differential was the subject of a dispute between plaintiffs and the Railroad. Subsequently, an alleged "equalization of pay agreement" was entered into in 1950 eliminating the differential. However, it was asserted that in May 1950 the Railroad terminated the "tonnage agreement" eliminating the bonus payments and failed to put into effect the new "equalization of pay agreement." The complaint then charged the Brotherhood with failing to take any steps to compel the Railroad to abide by the new agreement. The failure to act was allegedly because the Railroad "could control union officers at will."

Plaintiffs sought (1) a mandatory injunction to compel the Railroad to equalize wages paid to "tallymen" in its eastern and central regions; (2) damages against the Railroad for loss of earnings; (3) punitive damages against the Brotherhood for breach of a duty owed the plaintiffs; and (4) a return of dues collected by the Brotherhood during the critical period.

In their new complaint plaintiffs persist in pleading the existence of a so-called "equalization of pay agreement",

while at the same time they deny its existence. Their claim against the Railroad is put forth in Paragraph XVII of the complaint:

"The defendant carrier violated the Railway Labor Act when it terminated the 'tonnage agreement' unilaterally without first replacing it with 'the equalization of pay agreement' it had informally entered into with the defendant union. It also violated the Act when it refused to place in effect any equalization of pay agreement, thus maintaining two pay scales for the same work on its several regions."

By way of relief plaintiffs ask for (1) damages against the Railroad for losses in *salaries, lost vacations* and *sick leave;* (2) a mandatory injunction compelling the Railroad and Brotherhood to "execute" an "equalization of pay agreement", or in the alternative, an order directing the defendants to invoke the service of the National Mediation Board; and (3) punitive damages against the Brotherhood and a return of dues.

■ Initially it appears that plaintiffs are founding their cause of action against the Railroad on the same so-called contract that we previously held had never been consummated. In such a situation elementary principles of res judicata would bar this suit. However, on even more fundamental principle it is clear that plaintiffs' claim is barred by our prior judgment. This court stated in the earlier action that "[i]f plaintiffs have any claim at all against the Railroad it must be because of existing 'agreements' between the Brotherhood and the Railroad * * *." We then held, 275 F.2d at 343–344, that the exclusive tribunal for such cases as these is the Railroad Adjustment Board. Slocum v. Delaware, L. & W. R. R., 339 U.S. 239, 240, 70 S.Ct. 577, 94 L.Ed. 795 (1950). As we there said, "[i]f the plaintiffs claim that the provisions of the earlier ["tonnage"] agreement have not been lived up to, they may make their claims to the Railroad Adjustment Board, assuming that the claims would still be

timely." 275 F.2d at 345; 45 U.S.C. § 153, First (i) and (j).

■ Plaintiffs attempt to circumvent the above language by pressing the contention at oral argument that their claim against the Railroad is that the carrier violated the Act when it failed to give notice that it wished to and did terminate the "tonnage" wage agreement. Assuming arguendo that this is the gravamen of their complaint it is of no help to them. Section 6 of the Act imposes the duty of giving notice of an intended change in agreements on carriers and "representatives of the employees." An alleged failure on the part of a carrier to give that kind of notice might allow the union the right to invoke a corresponding sanction, see, e. g., Railroad Yardmasters of America v. Pennsylvania R. Co., 224 F.2d 226 (3 Cir.1955), but it creates no right in the individual employee to seek relief against the carrier for an alleged lack of notice.

Our earlier opinion is clearly dispositive and res judicata of plaintiffs' claim against the Railroad in this litigation.

■ In plaintiffs' claim against the Brotherhood we are faced with our prior holding that they had failed to allege the exhaustion of their internal union remedies and therefore could not seek relief in the courts. It remains to be seen whether they have corrected that defect with their current pleading.

Under the governing laws of the Brotherhood the structure of appeal available to plaintiffs is from the local to the Division Chairman, to the General Chairman, then to the Grand President; from his decision to the Grand Executive Council and finally to the quadrennial convention. The statements in the complaint indicate that they took their protest through the local to their Division Chairman. Upon failing to secure an acceptable adjustment, the Division Chairman presented the dispute to the General Chairman. The General Chairman's handling of the matter was unsatisfactory so the plaintiffs, individually and through the Division Chairman, appealed

from him to the Grand President. It is alleged that the Grand President sent two vice presidents to Philadelphia in 1950 who took testimony of the quarrel between the plaintiffs, the Railroad and the General Chairman. The report of these emissaries was submitted to their superior, but it is said he never did anything except that for four years he refused the requests of plaintiffs and the Division Chairman to resolve the problem; to this date he "refuses to even listen to any of the plaintiffs in their complaint against the carrier and the General Chairman * * *."

The next immediate step for the processing of plaintiffs' contention was to the Grand Executive Council and lastly to the convention of the Grand Lodge. From the complaint and affidavit it appears that plaintiffs made no attempt to appeal from the conduct of the Grand President, nor is any reason furnished for not utilizing that procedure. The factual situation is not unlike that in Fagan v. Pennsylvania R. R., 173 F.Supp. 465 (M.D.Pa.1959), involving the same Brotherhood. In Fagan plaintiffs also sought assistance in the courts against their union, alleging that they had taken their complaint up through the Brotherhood's chain of command to the Grand President but that he had refused to render a decision. They urged the inaction of the Grand President as a sufficient excuse for not appealing to the Grand Executive Council. The district court found that there was nothing in the Brotherhood's governing laws "which prevent[s] their recourse to the Grand Executive Council for such help as they feel they need regardless of the action or inaction of the President." 173 F.Supp. at 474. Accordingly, it was held that plaintiffs had not exhausted their internal union remedies. Apparently the court in Fagan did not have before it Article 16, Section 5 of the Brotherhood's Constitution which reads:

"Any lodge or member of the Brotherhood feeling aggrieved by the decisions of the Grand President in matters of Law and Equity may appeal to the Grand Executive Council within sixty (60) days after such decision * * *."

The use of the word "decision" would indicate that the Grand President must dispose of the issue before an aggrieved member could go on to the Council. There is nothing in the Brotherhood governing laws which gives the plaintiffs a right to appeal from the inaction of the Grand President: on the contrary, the entire appellate procedure is predicated on the existence of a decision at each stage. In view of the fact that plaintiffs were effectively stopped from obtaining a final union disposition of their grievance and having very much in mind the time element involved, we find that the allegations in their complaint make an adequate representation that they have taken all reasonable steps available to them within the Brotherhood's internal structure. Cf. O'Neill v. United Ass'n of Journeymen Plumbers, 348 Pa. 531, 36 A.2d 325 (1944); Browne v. Hibbets, 290 N.Y. 459, 49 N.E.2d 713, rehearing denied, 290 N.Y. 919, 50 N.E.2d 304 (1943).

Plaintiffs' suit against the Brotherhood rests upon alleged discrimination in violation of a right arising out of the Railway Labor Act and they urge that the district court has jurisdiction of the controversy. See Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The Steele rule is that a union which possesses the power to act for all employees of a bargaining unit has the corresponding duty to represent all the members of the unit fairly, impartially and in good faith, without "hostile discrimination" against any of them. Although originally employed in racial discrimination problems arising under the Railway Labor Act, the protection afforded by this doctrine has since been extended to encompass all forms of hostile discrimination. See Ford Motor Co. v.

Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952); Mount v. Grand Int'l Brotherhood of Locomotive Engineers, 226 F.2d 604 (6 Cir.1955), cert. denied, 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839 (1956); Cunningham v. Erie R. R., 266 F.2d 411 (2 Cir.1959); Hardcastle v. Western Greyhound Lines, 303 F.2d 182 (9 Cir.1962). In order to come within its ambit, the complaint before us must have more than conclusory statements alleging discrimination. In particular plaintiffs must make a showing that the action or inaction of the statutory representative complained of was motivated by bad faith, for the gravamen of the rule is "hostile discrimination." An allegation that certain conduct of the Brotherhood or a condition permitted to exist by it is "invidious" and "discriminatory", without a concomitant identification of lack of good faith, will not set forth a claim sufficient to call for the use of the Steele doctrine. Hardcastle v. Western Greyhound Lines, supra at 185–86; Colbert v. Brotherhood of Railway Trainmen, 206 F.2d 9, 12, (9 Cir.1953).

■ The question which remains, therefore, is whether the complaint sets forth a grievance grounded upon bad faith and ill will of the Brotherhood. The discrimination there set out is substantially that there was a geographical wage differential between the plaintiffs' Eastern Region and the Central Region, there being "no logical explanation for these differences, except that the company union never raised the question"; the Brotherhood had the duty to alleviate this pay differential, and did attempt to do so, its efforts culminating in the new "equalization of pay agreement". However, when the Railroad refused to place into effect this new agreement, Mr. Loehr, the Brotherhood's General Chairman, "failed in his statutory duty and [was] guilty of a breach of trust" as far as the plaintiffs were concerned by not pressing for more conferences with the Railroad: if the conferences could not be scheduled, or if they were held and were unsuccessful in producing an agreement, the General Chairman should have availed himself of an assorted number of remedies, including mediation, arbitration, a presidential fact finding board and an injunction preventing the Railroad from terminating the old tonnage agreement contrary to the Act. Despite the vagueness of the complaint there appear to be two possible specific charges of discrimination. First, the complaint stresses that the pay differential between the two regions is "irrelevant, invidious, and discriminatory." The thrust of this is that there is no fair reason for the differential and therefore the Brotherhood has discriminated against the plaintiffs by not eliminating the inequality. Second, plaintiffs, in their brief, focus on the complaint's language concerning the events following the failure of the Railroad to honor the "equalization of pay agreement": "The plaintiffs charge the Brotherhood with discrimination against them for not compelling the railroad to abide by the statutory commands to bargain once notice was given under Section 156 of the Act * * *."

Aside from the frivolous reliance upon a new "agreement" as an element in the alleged scheme of discrimination, both of plaintiffs' charges fail to meet the requisite standard of "hostile discrimination." Assuming that there was no justification for the geographical wage differential, plaintiffs nowhere allege that there has not been a good faith effort on the part of the Brotherhood to alleviate the consequent disparity. Indeed, ignoring our prior holding, they continue to contend that through the efforts of the Brotherhood a new agreement eliminating the differential was reached. The Brotherhood's bad faith, hostile discrimination on this view is at most illusory.

■ On the second allegation of discrimination the sole reference to bad faith motives appears in Paragraph XXII of the complaint. The substance of this is that in 1937 the Brotherhood demanded the Railroad to recognize it as the exclusive bargaining agent for these employees. The Railroad knew that the Brotherhood did not have a majority sta-

tus. However, in consideration for not refusing to recognize the Brotherhood the Railroad exacted a promise from the union "not to invoke the services of the National Mediation Board in a wage dispute, and not to press 'too hard' for wage increases." Thus, say the plaintiffs, "the failure to act in this dispute must be attributed to the promises the union made to the carrier." We do not discuss this at length because: first, in order for the allegation to have any validity it would have to be based on the assumption that the Brotherhood was never certified as the representative of these employees. Plaintiffs are silent on this point, and it would appear that the union has been certified. See 177 F.Supp. 421, 423, supra. Second, the allegation, if true, constituted a clear violation of the Act, 45 U.S.C. § 152, back in 1937. At this time it is a "bootstrap" operation to allege this as a means for acquiring federal competency under Steele. It is significant that plaintiffs have not argued the point, though they have not expressly abandoned it. Other than the above, plaintiffs say that the Brotherhood "discriminated" against them because it did not seek an injunction to enjoin the Railroad from terminating the "tonnage" agreement in alleged violation of the Act. This bare accusation without more is not the showing of improper motive or purposeful discrimination that exists in all the cases applying the Steele doctrine. Those decisions may be grouped in three broad categories: (1) racial discrimination dealing with a patent disregard and sacrifice of job opportunities and seniority rights of negro employees for the sole purpose of benefiting white employees; e. g., Steele v. Louisville & N. R. R., supra; Graham v. Brotherhood of Locomotive Firemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Conley v. Gibson, supra; (2) involving the arbitrary sacrifice of a group of employees' rights in favor of another stronger or more politically fa-vored group, often in direct violation of established union practice, e. g., Ferro v. Railway Express Agency, Inc., 296 F.2d 847 (2 Cir.1961); Mount v. Grand Int'l Brotherhood of Locomotive Engineers, supra; Hargrove v. Brotherhood of Locomotive Engineers, 116 F.Supp. 3 (D.D.C.1953); and (3) discriminatory measures taken against an individual which sacrificed his rights for hostile and improper reasons, e. g., Cunningham v. Erie R. R., supra; Brady v. Trans World Airlines, Inc., 174 F.Supp. 360 (D.Del. 1959); see also Bohannon v. Reading Company, 168 F.Supp. 662 (E.D.Pa. 1958). The common thread running throughout these opinions is the improper, usually bad faith, motivation for the course taken. That essential element is not present in the complaint or its collateral papers. Plaintiffs have no cause of action without it.

The judgment of the district court will be affirmed.

HASTIE, Circuit Judge (concurring in part and dissenting in part).

I join in the holding that the proper application of the doctrine of res judicata compels dismissal of the plaintiffs' claim against the railroad. I dissent from the dismissal of the claim against the union.

It is true, as the majority opinion points out, that the plaintiffs bear the burden of proving at trial that the union exhibited bad faith or "hostile discrimination" against the eastern tallymen in its action or non action as their representative in the controversy over the railroad's alleged imposition of an illegal pay differential upon the complaining group. But it seems to me that the complaint is sufficient to carry the plaintiffs at least into a pretrial exploration of what plaintiffs propose to show on this issue, particularly since, in its motion to dismiss, the union has made no point that bad faith or hostility toward the injured group was insufficiently alleged.