**LOCAL 194 C & T, UNITED TRANSPORTATION UNION, Plaintiff-Appellant,**

v.

**CONSOLIDATED RAIL CORPORATION and United Transportation Union, Defendants-Appellees.**

No. 81–1592.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1981.

Decided March 5, 1982.

---

Joseph V. Simeri, Sweeney, Butler & Simeri, South Bend, Ind., for plaintiff-appellant.

Hermon M. Wells, Consolidated Rail Corp., Law Dept., Philadelphia, Pa., James M. Mackey, May, Oberfell, Helling, Lorber, Campiti & Konopa, South Bend, Ind., for defendants-appellees.

Before BAUER and CUDAHY, Circuit Judges, and BAKER, District Judge.*

CUDAHY, Circuit Judge.

Plaintiff-Appellant Local 194 C & T of the United Transportation Union ("Local 194") brought this action challenging the lawfulness of an agreement entered into by the Consolidated Rail Corporation ("Conrail") and the United Transportation Union ("UTU"). The agreement allocated among various employee groups, including Local 194, work that had been consolidated under the authority of the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701–794 (1976) (the "Act"). The district court granted summary judgment in favor of the defendants Conrail and UTU, upholding the legality of the agreement under the Act. We conclude that Local 194's claim is sub-ject to mandatory arbitration under the Act and that the district court lacked subject matter jurisdiction to entertain the suit. Accordingly, we dismiss the appeal for want of jurisdiction and remand with instructions to dismiss the complaint.[1]

I.

Conrail is a rail carrier organized under the Act. 45 U.S.C. § 741 (1976). It is charged with management of the reorganized rail system created by the Act and is subject to the provisions of the Railway Labor Act. 45 U.S.C. § 772(a) (1976). UTU is the duly authorized and recognized bargaining representative of all Conrail operating employees, including conductors and trainmen. UTU's membership includes Local 194, which was chartered by UTU to represent conductors and trainmen in a geographic area extending from Chicago to Elkhart, Indiana. Local 194 apparently is composed primarily of former employees of the Penn Central Railroad; these employees became Conrail employees on April 1, 1976 when the Penn Central properties were conveyed to Conrail.

Congress recognized that in the wake of the many mergers and consolidations of the bankrupt railroads subject to the Act, a considerable restructuring of the work performed by the former employees of the predecessor lines would become necessary. Accordingly, in section 503 of the Act, 45 U.S.C. § 773 (1976), Congress granted Conrail the right to "assign, allocate, reassign, reallocate, and consolidate work formerly performed" on the properties of the predecessor railroads.[2] Two limitations were

---

* The Honorable Harold A. Baker, District Judge for the Central District of Illinois, is sitting by designation.

1. Title V of the Act, which is at issue in the instant case, was repealed by the Omnibus Budget Reconciliation Act of 1981, Pub.L.No. 97–35, § 1144(a)(1), 95 Stat. 669 (1981). The Budget Act, approved by Congress after the district court issued its decision in the instant case, overhauled the Conrail system and reduced employee protection benefits. The two sections most directly involved in this appeal, however, were reenacted with minor changes. See 45 U.S.C.A. §§ 797e, 797m (Supp. Dec.

1981). All references in this opinion, unless otherwise indicated, are to the Act prior to enactment of the Budget Act.

2. Section 503 of the Act provides:

The Corporation [Conrail] shall have the right to assign, allocate, reassign, reallocate, and consolidate work formerly performed on the rail properties acquired pursuant to the provisions of this chapter from a railroad in reorganization to any location, facility, or position on its system provided it does not remove said work from coverage of a collective-bargaining agreement and does not in-

placed on Conrail's exercise of this authority. First, the assignment of work by Conrail could not remove work from the coverage of an existing collective bargaining agreement and, second, the assignment could not "infringe upon the existing classification of work rights of any craft or class of employees at the location or facility" to which the work is assigned. Local 194's claim is premised upon the second limitation.

In a separate provision of the Act, Conrail was directed to "commence negotiations" on a "single implementing agreement" with the representatives of the employees of the predecessor railroads. § 504(b), 45 U.S.C. § 774(b) (1976). The statute enumerated specific subjects that were to be addressed in the single implementing agreement, including the method by which employees of the predecessor railroads were to be extended offers of employment with Conrail, as well as the procedure for determining the seniority of those employees within the Conrail system. The parties were directed by statute to preserve, to the extent possible, the "prior seniority rights" of the employees taken into Conrail's employ.

Pursuant to section 504(b), Conrail negotiated with UTU a single implementing agreement. Dated December 18, 1975, the agreement defined the procedure by which employees of the predecessor railroads were to be taken in as Conrail employees and specified the seniority rights that these employees were to enjoy. The agreement in addition provided for the interim application of existing collective bargaining agreements pending the negotiation of new agreements for each craft or class of em-

ployees in the Conrail system. *See* § 504(d), 45 U.S.C. § 774(d) (1976). For the purposes of the instant case, the most significant provision of the December 18, 1975, implementing agreement was Article VII. This provision required that, when Conrail exercised its right under section 503 of the Act to assign work, the parties (Conrail and UTU) meet to negotiate an additional agreement allocating equitably among the affected employees the rights to the assigned work. The implementing agreement outlined a general formula to be used in making such an allocation: work would be allocated according to a list of "work measurement factors" including the number of engine hours, cars dispatched, train or car miles or track miles on the affected lines.

Following conveyance of the bankrupt railroads to Conrail on April 1, 1976, numerous rail carrier lines were consolidated in order to eliminate duplicative and inefficient service. One of the larger consolidations involved the rerouting to traffic that had previously passed over the Erie Lackawanna Railway line between Chicago and Marion, Ohio. This line was not conveyed to Conrail and passed out of rail service entirely. The traffic from the Erie Lackawanna line was transferred to two Conrail lines (formerly Penn Central lines), each originating on the west in Chicago and running, respectively, through Fort Wayne, Indiana, to Crestline, Ohio, and through Elkhart Yard to Toledo and Cleveland. These two Conrail lines include the territory in which the members of Local 194 are employed. As a result of the consolidation, the former Erie Lackawanna employees became Conrail employees and a reassignment or reallocation of work became necessary.

fringe upon the existing classification of work rights of any craft or class of employees at the location or facility to which said work is assigned, allocated, reassigned, reallocated, or consolidated and shall have the right to transfer to an acquiring railroad the work incident to the rail properties or facilities acquired by said acquiring railroad pursuant to this chapter, subject, however, to the provisions of section 508 of this title. § 503, 45 U.S.C. § 773 (1976). The Omnibus Budget Reconciliation Act of 1981 reenacted

this provision, adding a sentence that requires Conrail and the bargaining representative of the employees affected by the assignment of work to negotiate an agreement allowing the employees to "follow their work." The authority granted by this section to Conrail was in addition limited in duration to the period in which employee protection benefits under the Act remain available. 45 U.S.C.A. § 797e (Supp. Dec. 1981).

Pursuant to section 503 of the Act and, more particularly, Article VII of the single implementing agreement, Conrail and UTU on November 17, 1980, entered into an agreement allocating the rights to the consolidated work among the former Erie Lackawanna employees, the members of Local 194 and others. The parties agreed that the Erie Lackawanna employees were entitled to 10.27 percent of the work on the surviving lines based upon the increase in traffic resulting from the elimination of the Erie Lackawanna line and the rerouting of its traffic to the two Conrail lines. This meant that 10.27 percent of the work would be reserved for the former Erie Lackawanna employees and allocated within that group according to the existing seniority roster. The remainder of the work was thus left for the other Conrail (formerly Penn Central) employees, to be distributed according to their own separately-maintained seniority list.

The November 17, 1980, agreement, called an equity allocation agreement, is a device commonly employed in the railroad industry to allocate work on merged or consolidated railroads. *See, e.g., Williams v. United Transportation Union*, 90 L.R. R.M. 2475 (N.D.Ohio 1975); *Freeman v. Grand International Brotherhood of Locomotive Engineers*, 375 F.Supp. 81 (S.D.Ga.), aff'd, 493 F.2d 628 (5th Cir. 1974). Typically, as in the instant case, work on the consolidated line is apportioned on a percentage basis, thereby arranging as best practicable for each employee group to follow the work it previously performed. The November 17, 1980, agreement was the last in a series of six such equity agreements between Conrail and UTU concerning the territory involved in the instant case. In addition, Conrail has negotiated seven similar agreements with the Brotherhood of Locomotive Engineers allocating work in the same territory. Overall, there are approximately 85 equity agreements presently in force on the Conrail system.

Local 194, having exhausted its intra-union remedies,[3] filed suit in the district court on December 5, 1980. The complaint sought declaratory and injunctive relief from the implementation of the November 17, 1980, equity agreement which, Local 194 alleged, violated section 503 of the Act. Local 194 claims that the equity agreement infringes upon "the existing classification of work rights" of its members in the Chicago-Elkhart territory. Specifically, Local 194 contends that the effect of the equity agreement is to allow a former Erie Lackawanna employee to enter the Chicago-Elkhart territory and displace from a conductor's position a Local 194 member having greater seniority. This "bumping" produces a "domino effect" in which the conductor displaced by an Erie Lackawanna employee may move down into the road trainman classification and bump a lesser-seniority trainman who, in turn, may replace an employee on the Extra Board, the lowest job classification. This "domino effect," which both Conrail and UTU concede is a possible consequence of the equity agreement, is alleged to violate the "classification of work rights" of the displaced employees.

On March 12, 1981, the district court granted summary judgment in favor of the defendants, Conrail and UTU. The court did not rule on Conrail's earlier motion to dismiss the complaint for lack of subject matter jurisdiction. Local 194 appeals from the district court's ruling.

## II.

▪ Section 503, upon which Local 194's claim is based, is part of Title V of the Act, 45 U.S.C. §§ 771–780 (1976), which deals broadly with the protection of employees adversely affected by the Act's restructuring of the rail system. Section 507 provides for the arbitration of disputes arising under Title V:

Any dispute or controversy with respect to the interpretation, application, or enforcement of the provisions of this ti-

---

**3.** Local 194 makes no claim that UTU breached its duty of fair representation during its partici- pation in the negotiation of the equity agreement.

tle, except section 504(d), section 509(b), or section 509(c) and those disputes or controversies provided for in subsection (g)(2)(D) of section 505 and subsection (b) of section 504 which have not been resolved within 90 days, may be submitted by either party to an Adjustment Board for a final and binding decision thereon as provided in section 3 Second, of the Railway Labor Act . . . .

§ 507, 45 U.S.C. § 777 (1976). The cross-reference to "final and binding" decisions under section 3 Second of the Railway Labor Act, 45 U.S.C. § 153 Second (1976), when considered in connection with the similarity of language between section 507 and the arbitration provisions of the Railway Labor Act,[4] indicates that Congress intended that disputes arising under Title V be resolved in the same manner as disputes involving the interpretation and application of collective bargaining agreements under the Railway Labor Act.

Section 3 of the Railway Labor Act has long been held to mandate compulsory arbitration of disputes involving the interpretation or application of collective bargaining agreements. *Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978) (per curiam); *Andrews v. Louisville & Nashville Railroad*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *Gunther v. San Diego & Arizona Eastern Railway*, 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965); *Pennsylvania Railroad v. Day*, 360 U.S. 548, 79 S.Ct. 1322, 3 L.Ed.2d 1422 (1959). Such disputes, which are denominated "minor disputes," are to be contrasted with so-called "major disputes," which involve the *formation* or *amendment* of collective agreements and which are subject to a different dispute resolution procedure. *Elgin, Joliet & Eastern Railway v. Burley*, 325 U.S. 711, 722–28, 65 S.Ct. 1282,

1289, 89 L.Ed. 1866 (1945). "[E]xclusive primary jurisdiction" over "minor disputes" is vested in the National Railroad Adjustment Board, *Day*, 360 U.S. at 552, 79 S.Ct. at 1324, and both federal and state courts lack jurisdiction to adjudicate such claims. *Slocum v. Delaware, Lackawanna & Western Railroad*, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950); *Order of Railway Conductors v. Southern Railway*, 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811 (1950).

In establishing the Adjustment Board, Congress sought to create a body having the expertise to deal with the often arcane problems of railroad management. Composed of representatives of both management and labor, the Adjustment Board is particularly well-suited to the task of interpreting and applying collective bargaining agreements against the backdrop of the Railway Labor Act. *Slocum v. Delaware, Lackawanna & Western Railroad*, 339 U.S. 239, 243, 70 S.Ct. 577–79, 94 L.Ed. 795 (1950). We think the same considerations apply to disputes arising under Title V of the Act, particularly where, as here, the dispute concerns the interpretation or application of a collectively bargained agreement. We thus conclude that section 507 dictates mandatory arbitration of Title V disputes. *See also United Transportation Union v. Consolidated Rail Corp.*, 417 N.E.2d 944 (N.D.Ind.1980).

■ Local 194 asserts that in the instant case the equity agreement negotiated by Conrail and UTU violates section 503 of the Act by infringing upon an "existing classification of work rights" applicable to Local 194 members. Because this claim involves the interpretation, application or enforcement of section 503, which is a Title V provision, the dispute falls squarely within the reach of the arbitration provision of the

---

4. Section 3 (First)(i) of the Railway Labor Act provides:

> The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

§ 3 (First)(i), 45 U.S.C. § 153 (First)(i) (1976).

Act. Local 194's claim thus should have been submitted to arbitration and the district court was without jurisdiction to hear the complaint. *See Herbert v. Consolidated Rail Corp.*, Civ. No. 79–3000 (D.N.J.1980); *Connor v. Brotherhood of Railway, Airline & Steamship Clerks*, 496 F.Supp. 154 (M.D. Pa.1980); *Crookham v. Consolidated Rail Corp.*, 489 F.Supp. 1 (N.D.Ohio 1978), *aff'd*, 620 F.2d 301 (6th Cir. 1980); *Vanderberg v. Consolidated Rail Corp.*, 88 Lab.Cas. ¶ 11,-849 (E.D.Mich.1979); *Zappitello v. Consolidated Rail Corp.*, Civ. No. 79–2239 (N.D. Ohio 1979); *Crump v. Consolidated Rail Corp.*, Civ. No. 77–652–N (E.D.Va.1977) (Title V claims dismissed for lack of subject matter jurisdiction).

Local 194 nonetheless resists this conclusion by invoking the exception in section 507 for "disputes or controversies provided for" in section 504(b). Local 194 argues that because it challenges the lawfulness of a part of the single implementing agreement, which section 504(b) required the parties to negotiate, its claim falls within the exception to arbitration provided in section 507. Local 194 broadly asserts that "disputes or controversy involving Single Implementing Agreements are not within the jurisdiction of the Arbitration Board." Plaintiff-Appellant's Brief at 26.

█ Local 194 has, however, seriously overstated the breadth of the exception in section 507 for disputes "provided for" in section 504(b). Section 504(b) requires Conrail and the appropriate bargaining agent to commence negotiations on a single implementing agreement that must contain certain enumerated provisions. If the parties fail to reach agreement within 30 days, section 504(b) imposes a special dispute resolution procedure culminating in a referee's decision that becomes the "final and binding" implementing agreement. When Congress excepted disputes "provided for" in section 504(b) from arbitration under section 507, we think it obviously had reference to those disputes for which an alternative grievance procedure was established in section 504(b). Thus, the "provided for" language, which is employed only in connec-

tion with the exceptions for sections 504(b) and 505(g)(2)(D), was intended to limit the reach of the exception for section 504(b) to disputes over the *formation* of a single implementing agreement. Local 194's argument, which would remove from compulsory arbitration all disputes arising from single implementing agreements, is without basis in the Act and, moreover, is inconsistent with the long history of submitting disputes over the interpretation and application of collective bargaining agreements to compulsory arbitration.

We thus conclude that the exception in section 507 for disputes "provided for" in section 504(b) is restricted to disputes for which section 504(b) provides a special arbitration procedure. Because the instant dispute does not stem from a controversy over the negotiation of a single implementing agreement but rather from the interpretation and application of such an agreement, the dispute is not exempt from mandatory arbitration under the Act. The district court therefore lacked jurisdiction to entertain this action and we must accordingly dismiss the appeal for want of jurisdiction and remand the case to the district court with instructions to dismiss the complaint.

Appeal Dismissed. Remanded.